**Robert B. CARLTON and Bobbie L. Carlton, Plaintiffs-Appellees,**

v.

**H. C. PRICE COMPANY and Roger Dale Moyers, Defendants-Appellants.**

No. 79–1422.

United States Court of Appeals, Fifth Circuit.

March 16, 1981.

Marcus R. Clapp, Doris R. Ehrens, Fairbanks, Alaska, for defendants-appellants.

O. Nelson Parrish, Fairbanks, Alaska, John O'Quinn, Murphrey, O'Quinn & Cannon, Houston, Tex., for plaintiffs-appellees.

Before HILL, RUBIN and ANDERSON, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

This appeal arises out of a personal injury diversity action tried in the Southern District of Texas. Plaintiffs-appellees, Robert and Bobbie Carlton, are husband and wife who were injured in an accident involving the motorcycle they were riding and a vehicle operated by defendant-appellant, Roger

Moyers, an employee of defendant-appellant, H. C. Price Company. Because the issue of liability had been conceded, the four and one-half day trial concerned only the amount of damages due appellees. The parties stipulated that "the provisions of the laws of Alaska relating to pre-judgment interest, offers of judgment, attorneys' fees, and case costs shall be applied by the federal court, Galveston Division, in the same manner and with the same effect as would have been done by the State Court of Alaska, provided, however, that pre-judgment interests shall be suspended effective January 11, 1978." Record on Appeal at 12.

The issues on appeal include the following: (1) whether the district court's award of pre-judgment interest on future medical damages was proper under Alaska law; (2) whether the jury's awards of future medical expenses in the amount of $130,000 for Bobbie Carlton and $60,000 for Robert Carlton were supported by the evidence; (3) whether the district court abused its discretion under Alaska law in making its award of attorney's fees.[1]

We affirm the trial judge's award of pre-judgment interest on future medical damages. We hold with respect to the award of future medical expenses to Bobbie Carlton, that $91,544 is the maximum amount reasonably supported by the evidence. We hold with respect to the award of future medical expenses to Robert Carlton, that $29,075 is the maximum amount reasonably supported by the evidence. If plaintiff-appellee Bobbie Carlton declines to make a remittitur in the amount of $38,456 (i. e., $130,000 minus $91,544), and if plaintiff-appellee Robert Carlton declines to make a remittitur in the amount of $30,925 (i. e., $60,000 minus $29,075), then we order a new trial, with respect to either or both of them on the issue of future medical expenses only. Finally, we affirm the district court's application of the attorney's fee schedule, but remand for redetermination of attorney's fees under the schedule in light of our holding with respect to future medicals.

## PRE–JUDGMENT INTEREST ON FUTURE DAMAGES

■ The district court determined that prejudgment interest should be awarded on the future medical damages. Appellants argue that such an award amounts to double recovery because "appellees have not been deprived of the use of the money awarded them for the future medicals." (Brief of appellants at 28–29.) Although appellants have cited no cases squarely supporting their position, they purport to find support for their position from *Beaulieu v. Elliott*, 434 P.2d 665 (Alaska 1967), and *ERA Helicopters, Inc. v. Digicon Alaska, Inc.*, 518 P.2d 1057 (Alaska 1974). *Beaulieu* recognized that an undiscounted present money award in the exact dollar amount of an expense or loss to be incurred in the future would overcompensate for that expense or loss. However, *Beaulieu* refused to discount to present value such an award, reasoning that inflation would offset such overcompensation. Appellants argue that *Beaulieu* suggests that such an undiscounted dollar award is full compensation for expenses or losses to be incurred in the future, and therefore that prejudgment interest would amount to double recovery which has been forbidden by *ERA Helicopters, Inc. v. Digicon Alaska, Inc., supra*, and *State v. Stanley*, 506 P.2d 1284 (Alaska 1973).

■ Although appellants' argument has some appeal, we believe it runs contra to Alaska precedent. For example, in *State v. Phillips*, 470 P.2d 266 (Alaska 1970), prejudgment interest was awarded for damages which included expenses to be incurred in the future for housekeeping services, and included a husband's loss of services in the

---

1. Appellants originally challenged the district court's use of an 8% computation rate for pre-judgment interest beginning September 12, 1976, the date the applicable rate of interest was increased from 6%. They have now withdrawn that challenge because of the ruling of the Supreme Court of Alaska in *Drickersen v. Drickersen*, 604 P.2d 1082 (Alaska 1979) approving the use of the 8% rate beginning September 12, 1976. We do not address the issue here.

future from his deceased wife. 470 P.2d at 272. The purpose of prejudgment interest recognizes that the injured party was injured at the moment the cause of action accrued, and that the injured party is entitled to be made whole as of that moment. Thus, the purpose of prejudgment interest is to put a plaintiff in the position he would have been in had he had his trial and recovered his judgment immediately after his injury. *Accord, City and Borough of Juneau v. Commercial Union Insurance Co.,* 598 P.2d 957 (Alaska 1979).

*Beaulieu* can provide no comfort for appellants. The Supreme Court of Alaska, in *State v. Phillips, supra,* expressly stated that "[w]e do not believe *Beaulieu* has any application to the prejudgment interest problem in the case at bar because inflation and wage increases are not significant factors in the normal period between accrual of the cause of action and judgment." 470 P.2d at 274, n. 28. We can see the logic of *Phillips'* rejection of the analogy from *Beaulieu.* While inflation may offset the refusal to discount damages for future losses to present value, that process does not affect the disparity between a plaintiff who receives his trial and judgment the day after an injury and a plaintiff who receives his judgment after years of protracted litigation.[2] Under *Beaulieu* both plaintiffs would receive a dollar amount without reduction to present value; but prejudgment interest is necessary to place the latter plaintiff in the same position as the former.

Nor can appellants derive any comfort from *ERA Helicopters, Inc. v. Digicon Alaska, Inc., supra,* or *State v. Stanley, supra.*

Those cases simply permit, as a substitution for prejudgment interest, an award for the actual provable damages attributable to the loss of the use of the damaged property. For example, in *Stanley,* plaintiff was awarded damages in the amount of the value of a vessel which had been negligently sunk, and also damages for the loss of the use of that vessel from the time of its sinking until the judgment, at which time plaintiff received a dollar award equal to the value of the vessel. The court noted that damages for the loss of use of the vessel were simply a more appropriate substitute for prejudgment interest. We also note that the *Stanley* case cites *State v. Phillips, supra,* with apparent approval. 506 P.2d at 1295, n. 23. In the instant case, appellees have not received a substitute for prejudgment interest, and accordingly *ERA Helicopters* and *Stanley* are inapposite.

We conclude that the award of prejudgment interest on the entire judgment, including that portion allocated to future medical expenses, was proper under Alaska law.[3]

## SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE JURY AWARD OF FUTURE MEDICAL EXPENSES

Appellants next challenge the sufficiency of the evidence to support the jury's awards of future medical expenses in the amount of $130,000 to Bobbie Carlton and $60,000 to Robert Carlton. They present two arguments. They assert, first, that the jury's respective awards exceeded the maximum amounts that could have been awarded according to the evidence presented, even as-

---

**2.** The *Phillips* court was concerned with precisely this disparity. 470 P.2d at 274.

**3.** We note, finally, that appellants cannot rely on *City of Whittier v. Whittier Fuel and Marine Corp.,* 577 P.2d 216 (Alaska 1978). Although the Supreme Court of Alaska, in *City of Whittier,* refused to award prejudgment interest on the loss of future profits in that contract case, the court cited *State v. Phillips,* 470 P.2d 266 (Alaska 1970) with approval. The court noted the *Phillips* rule that prejudgment interest would be awarded "unless for some reason peculiar to an individual case such an award of interest would do an injustice." 577 P.2d at

226, *quoting State v. Phillips,* 470 P.2d at 274. The court then concluded, "[w]e believe an injustice would be done if interest is awarded on lost future profits not yet accrued at the time of judgment." 577 P.2d at 226. We are bound by the distinction established in the Alaska law by the Supreme Court of Alaska. The instant case does not involve future profits and thus *City of Whittier* does not control. The instant case is a tort case involving future medical expenses and is controlled by *Phillips,* a tort case involving future expenses for housekeeping services.

suming that the evidence was entirely competent. Secondly, they argue that the evidence was not entirely competent because some of it was based on speculation. They ask this court to reduce the amount of each award of future medicals to the respective amounts allegedly supported by the evidence or, in the alternative, to remand the case for a new trial on the issue of future medical expenses.

■ A preliminary issue is whether appellants' contention concerning the future medical awards is properly before this court. Appellees contend that because appellants did not serve or file a motion for new trial on the ground that the future medicals damage awards were excessive, this court cannot address the question. We reject that argument.

■ We have held that "there can be no appellate review [of allegedly excessive or inadequate damages] if the trial court was not given an opportunity to exercise its discretion on a motion for new trial." *Baker v. Dillon*, 389 F.2d 57, 58 (5th Cir. 1968). *Accord Calcagni v. Hudson Waterways Corp.*, 603 F.2d 1049 (2d Cir. 1979) (where court of appeals held "[a]ppellant made no motion in the trial court based on . . . [the excessiveness of the damage award] ground . . . precluding its bare assertion in this court." 603 F.2d at 1051).[4] The purpose of a motion for new trial is to allow the trial

court to exercise its discretion as to whether the particular issue should be redetermined before a new jury. *Urti v. Transport Commercial Corp.*, 479 F.2d 766 (5th Cir. 1973). It is apparent from the record in this case that during the post-verdict hearing, the trial judge was given the opportunity to exercise his discretion as to whether the issue of damages for future medical expenses should be redetermined before a new jury. Whether or not appellants used the magic words "new trial," it is clear that they squarely presented to the trial judge their contention that the damage awards for future medicals were excessive, and that he, in the exercise of his discretion, held that the evidence did support the award. In paragraph 6 of the Findings of Fact and Conclusions of Law Concerning Post-Verdict Matters, the court found:

> Counsel advises that there is some contention that the evidence is not sufficient to support the jury findings as to future medical. This contention is rejected. The court specifically finds that there is adequate evidence to support the jury findings with reference to future medical expense.

Record on Appeal at 288. Under these circumstances, appellants have complied with the prerequisites for appellate review of the issue. The purpose—to allow the trial court to exercise its discretion—has been fulfilled.[5]

4. Like other motions, a motion for a new trial "unless made during a hearing or trial shall be made in writing, shall state with particularly the grounds therefore, and shall set forth the relief or order sought." Fed.R.Civ.P. 7(b). Although appellants apparently did not make a written motion for a new trial, they assert by affidavit filed in this court that during the post-verdict hearing conducted by the trial judge, they moved orally for a new trial on the ground that the jury's award of future medical expenses was excessive. Appellees dispute that a motion for a new trial was made. The record on appeal does not include a transcript of the post-verdict hearing, and counsel for appellants asserts, also by affidavit filed in this court, that none is available.

Appellants' oral motion for new trial on the ground that the damage award was excessive would suffice to satisfy the requirement that a motion for a new trial be made as a prerequi-

site to appellate review of the excessive damages issue. *See Douglas v. Union Carbide Corp.*, 311 F.2d 182 (4th Cir. 1962). We cannot, however, presume on the basis of appellants' affidavit that such a motion was made because appellants have failed to comply with the requirements of Fed.R.App.P. 10(c) (providing a mechanism for preparing a statement of proceedings below for which a transcript is unavailable). *Murphy v. St. Paul Fire and Marine Insurance Co.*, 314 F.2d 30 (5th Cir. 1963); 9 J. Moore, *Federal Practice* ¶ 210.06 (2d ed. 1980); *Accord, Davis v. City of Abbeville*, 633 F.2d 1161 (5th Cir. 1981).

5. There is authority for a determination that technical compliance with the requirements of Fed.R.Civ.P. 7(b) is not essential. Other courts, in different contexts, have sanctioned substantial, but nontechnical compliance with Rule 7(b). *See, e. g., Brown v. Wright*, 588 F.2d 708 (9th Cir. 1978) (court of appeals held

■ Having decided that the issue of the excessiveness of the future medicals award is properly before us, we must determine whether the district court committed a clear abuse of discretion in declining to set the verdict aside. *Morgan v. Commercial Union Assurance Companies*, 606 F.2d 554 (5th Cir. 1979).[6] The district court was required to consider whether the damages were excessive in light of the standard of proof of medical expenses under Alaska law. *See Davis v. Safeway Stores, Inc.*, 532 F.2d 489, 491 (5th Cir. 1976). Alaska law requires that future medical damages be proved "to a reasonable certainty that they will occur in the future." *City of Fairbanks v. Nesbett*, 432 P.2d 607, 618 (Alaska 1967). The district judge's conclusion that the future medical damages were not excessive thus implies the determination that the elements of future medical expenses which were totalled to reach the damage awards for future medicals were proved to a reasonable certainty.

■ We will first address appellants' argument that the evidence does not support the amount of the respective awards for future medical expenses to Bobbie Carlton and to Robert Carlton. Appellants point out that the witnesses testified to ranges of costs for future medical care for the Carltons. They contend that even when one adds up the maximum amount to which the experts testified with respect to each element of future medical expenses, the jury's awards of $60,000 and $130,000 to Mr. and Mrs. Carlton, respectively, are not justified. We agree. The table below shows the various elements of future medical expenses which the witness' testified would be needed by the Carltons:

BOBBIE CARLTON'S FUTURE MEDICAL EXPENSES

| Procedure | Cost | Witness | Supp. Record On Appeal |
|---|---|---|---|
| 1. Shoulder Operation | $2500–3000 * | Dr. Moore | p. 68 |
| 2. Back Fusion | $8000–10,000 * | Dr. Moore | p. 69 |
| 3. Hip Replacement | $6000 * | Dr. Moore | p. 69 |
| 4. Bladder Care [7] | | Dr. Moore | p. 69 |
| a. Repeated Surgery | $8000–10,000 * | | |
| or | | | |
| b. Replacement of Implant | $2000–2500 | Dr. Scott | p. 255 |
| 5. General Medical Care @ $700–800 Per Year [8] | $27,168 * | Dr. Moore | p. 70 |
| 6. Routine Neurological Care @ $600/yr. [9] | $20,376 * | Dr. Rashti | p. 20 |

---

that "motion for reconsideration of judgment" with its supporting memorandum should be viewed as a motion for a new trial and that the substance of such supporting memorandum, if not its form, managed, barely, to present a good claim in support of a motion for new trial); *Smith v. Danyo*, 585 F.2d 83 (3d Cir. 1978) (court of appeals held that even if requirement of Rule 7(b), Fed.R.Civ.P., that all applications to a court for an order be by motion were to be read into the provisions seeking recusal of a judge under 28 U.S.C. § 144, the affidavit and certificate filed in that case served all the purposes of that rule even though the application to the court for an order was called an "affidavit" and not a "motion.") *See also* generally 11 C. Wright and A. Miller, *Federal Practice and Procedure*, § 2811 (Civil) (1973), which indicates that motions for new trial are to be given broad construction.

6. *See also Bridges v. Groendyke Transport, Inc.*, 553 F.2d 877, 879–80 (5th Cir. 1977) for discussion of the standard of appellate review of the trial court's denial of a motion for new trial on the ground of excessiveness of the verdict.

7. There was disagreement between Drs. Moore and Scott with respect to the kind of bladder care Bobbie Carlton will need in the future.

8. Dr. Thomas Mayor, Professor of Economics who appeared on behalf of the Carltons figured Bobbie Carlton's future general medical care costs based on a life expectancy of slightly less than 34 years. Using the $800 per year figure, he arrived at the lump sum of $27,168. Supp. Record on Appeal, vol. II at 201–202.

9. Using the $600 per year figure and a life expectancy of slightly less than 34 years, Dr. Mayor arrived at the lump sum of $20,376 for Bobbie Carlton's future routine neurological care. Supp. Record on Appeal, vol. II at 202.

BOBBIE CARLTON'S FUTURE MEDICAL EXPENSES

| Procedure | Cost | Witness | Supp. Record On Appeal |
|---|---|---|---|
| 7. Psychological Care [10] | | | |
|   a. Behavior Modification | $3000– 6000 | Dr. Rashti | p. 18 |
|     or | | | |
|   b. Long-term Support Therapy | $8000– 15,000 * | Dr. Rashti | p. 18 |
| TOTAL of maximum amounts for each category (marked by *) | $91,544.00 | | |

ROBERT CARLTON'S FUTURE MEDICAL EXPENSES

| Procedure | Cost | Witness | Supp. Record On Appeal |
|---|---|---|---|
| 1. Knee Surgery [11] | | | |
|   a. Patella Free-up | $3000– 4000 * | Dr. Moore | p. 105 |
|   b. Knee Replacement | $4500– 5000 * | Dr. Moore | p. 105 |
|   c. Knee Fusion | $4000 * | Dr. Moore | p. 105 |
| 2. Wrist Fusion | $3000– 3500 * | Dr. Moore | p. 106 |
| 3. Routine Annual Care @ $500/yr. [12] | $12,575 * | Dr. Moore | p. 111 |
| TOTAL of maximum amounts for each category (marked by *) | $29,075.00 | | |

It is clear that even when the maximum possible costs (marked by *) for each procedure are added together, the totals come to $91,544 for Bobbie Carlton and $29,075 for Robert Carlton, respectively.

We reject the Carltons' argument that the jury could have arrived at the $130,000 and $60,000 figures by considering the following factors: (1) that the bladder procedure performed on Bobbie Carlton might need to be repeated because of mechanical or other failure of the implanted device; (2) that any of Robert Carlton's various surgeries might have failed as well; (3) that the Carltons might live longer than the average life expectancies derived from the standard table would suggest; (4) that the Carltons would incur significant home health costs in

connection with their various projected hospitalizations; (5) that they would incur vocational rehabilitation expenses. These other possible factors are merely speculative. The testimony regarding the possibility of failure of the surgical procedures faced by Bobbie and Robert Carlton did not provide a basis for an increase in the award beyond the figures to which the witnesses testified. As noted below, it is probable that some of the expert testimony did in fact consider the probability of repeated bladder operations for Bobbie Carlton. However, we believe that it would be speculative for the jury to guess at a figure in excess of those provided by the expert testimony. There was no testimony that the Carltons could be expected to live longer than the life expectancies derived from the standard table. Nor was there any testimony with respect to the need for or cost of home health care. Finally, there was no testimony with respect to vocational rehabilitation costs.

Accordingly, we agree with appellants that the award to Bobbie Carlton of future medical costs is in error to the extent that it exceeds $91,544, and that the award of future medicals to Robert Carlton is in error to the extent that it exceeds $29,075. We held in *Jamison Co. v. Westvaco Corp.*, 526 F.2d 922, 930 (5th Cir. 1976), "[a] verdict in excess of the maximum amount calculable from the evidence is not legally 'within the range of evidence.'" In the instant case, the verdicts with respect to damages for future medical expenses cannot stand without modification.

Appellants also argue that certain of the elements of the future medical awards are based on speculation and that the total award with respect to each must be reduced accordingly. They argue first that the evidence regarding Bobbie Carlton's bladder care will support no more than an award of

---

**10.** Dr. Rashti's testimony indicated that one or the other, but not both, of these types of psychological care would be needed. *See* text, *infra,* p. 581 for discussion of Dr. Rashti's testimony.

**11.** These three knee procedures are not mutually exclusive. The fusion is apparently an alternative if the knee replacement does not work. The patella free-up is a prerequisite to an at-

tempted knee replacement. See Supp. Record on Appeal, vol. II, pp. 102–105.

**12.** Dr. Thomas Mayor, Professor of Economics, who testified on behalf of the Carltons, figured the annual cost of Mr. Carlton's routine medical care based on a life expectancy of 25.5 years. Using a $500 per year figure, he arrived at the lump sum of $12,575. Supp. Record on Appeal, vol. II, p. 201.

the $2,500 figure testified to by Dr. Scott, the urologist who implanted her bladder prosthesis. They point out that $8,000–10,-000 figure for the cost of bladder care was given by Dr. Moore, who is not a urologist but is an orthopedic surgeon who treated Bobbie Carlton. We note, however, that the record shows that in April, 1977 Bobbie Carlton underwent bladder surgery which was unsuccessful to correct her problem. Then in November, 1977, Dr. Scott implanted the device to enable Bobbie Carlton to control her bladder function. The device functioned properly, accordingly to Dr. Scott, at least until July, 1978, when a mechanical failure caused it to be ineffective. While Dr. Scott was able to state that the success rate for patients who have the implant operation Bobbie Carlton had is 90%, he was not able to state the percentage of mechanical failure of the devices. Supp. Record on Appeal, vol. III at 253. We understand this testimony to mean that one in ten patients who receive the implant will not have successful results even if the implant device is mechanically perfect. We understand further that the percentage of mechanical failure, such as Bobbie Carlton experienced, is not predictable. At the time of Dr. Scott's second deposition in this case, in October, 1978, Bobbie Carlton's bladder implant was not functioning properly. Dr. Scott was not certain whether she would need an entire replacement or repair of the existing device. The cost of entire replacement surgery was $2,000–2,500, Dr. Scott testified, only about $800 more than the cost of repair. (Supp. Record on Appeal, vol. III at 255–256).

Against this testimony is the testimony of Dr. Moore that the future cost of Bobbie Carlton's bladder surgery and related hospitalization would be $8,000–10,000. Supp. Record on Appeal, vol. I at 69. Dr. Robinson, another urologist who treated Bobbie Carlton, testified that Bobbie Carlton's annual requirements with respect to the care of her bladder would be comparable to or even greater than the medical treatment she required in the first ten months of 1977. Supp. Record on Appeal, vol. I at 124; 145–147. Finally, Dr. Rashti, the neurologist

who was consulted with regard to Bobbie Carlton's bladder functioning, testified that the bladder implant device would not work permanently but would need to be revised in the future. Supp. Record on Appeal, vol. I at 7; 21; 39–40.

We think that the jury was justified in relying on the $10,000 figure for Bobbie Carlton's future bladder care. The testimony of Dr. Robinson and Dr. Rashti supports the view that the attempts to deal with Bobbie Carlton's bladder dysfunction would probably have to be repeated over the years. Even Dr. Scott, who testified that the bladder implant device was highly successful when its mechanical functioning was proper, could not testify that mechanical malfunctioning, such as Bobbie Carlton experienced within less than a year of her initial implant, would not be a problem again.

Appellants also challenge the $600 a year figure for neurological care of Bobbie Carlton. Their argument is essentially that the testimony of the Carltons' witness, Dr. Rashti, with respect to the cost of the needed annual neurological care for Bobbie Carlton, was internally inconsistent. Dr. Rashti testified that the charges for his care of Bobbie Carlton within the last year had totalled approximately $450. When asked whether he would need to see Bobbie Carlton as intensively in the future as he had seen her within the past year, he replied, "Really depends on how her medical care is structured." Supp. Record on Appeal, vol. I at 24. Dr. Rashti also testified that $600 per year was a reasonable or conservative figure for the neurological care Bobbie Carlton would need. Supp. Record on Appeal, vol. I at 20. When counsel for the Carltons asked about the basis for the $600 figure, the following colloquy took place:

Q. This $600.00 a year for neurological followup, is that permanent or temporary?

A. Again, it all depends on how you structure her medical care. She got a number of doctors, and some of the services are overlapping. If I was her primary physician, I would think it would

run initially, I probably would see her every month. Eventually I would get her down hopefully to once or twice a year. I don't know what length of time we are talking about, my guess would be several years to get her down where she is coming in once or twice a year. Obviously her costs are up, but you have medication costs, so you are on the low side to begin with. You are on the high side at that far end. But orthopedic consultations, which she would be receiving very frequently, urology consultations, and she would need some psychiatric support for a while. To answer that question correctly you would have to look at the total picture and decide who is taking care of her and he is taking care of her. I hope that answers the question.

Supp. Record on Appeal, vol. I at 36–37.

We think that there is no internal inconsistency in Dr. Rashti's testimony. It is clear that in arriving at the $600 a year figure, he was taking into account both the fact that Bobbie Carlton has several doctors who provide overlapping services and the fact that the cost of her neurological care will be higher in the short run than it will be in the long run. In light of these factors, we do not think that the fact that the cost of Dr. Rashti's services was only $450 in the preceding year refutes Dr. Rashti's view that Bobbie Carlton's future neurological care would cost $600 a year.

Finally, with respect to Bobbie Carlton's future medical expenses, appellants challenge the $15,000 figure for future psychological care. Appellants argue, first, that Dr. Rashti, a neurologist, was not competent or qualified to testify to the need for psychological counseling. Secondly, they argue that even if accepted, Dr. Rashti's testimony would support no more than a $6,000 figure for psychological care, because the $15,000 figure reflected in-depth psychoanalytic therapy which Dr. Rashti testified would probably not be appropriate.

The district court overruled the objection of appellants' counsel to the competency of Dr. Rashti in the psychiatric area. Supp. Record on Appeal, vol. I at 18. We agree. With respect to appellants' second argument, we have reviewed the record and we are convinced that Dr. Rashti testified about three types of psychological services: behavior modification at a cost of $3,000–$6,000; long-term supportive psychological services at a cost of $8,000–$15,000; and in-depth psychoanalytic therapy with no cost estimate. Supp. Record on Appeal, vol. I at 18–19. Dr. Rashti testified that in-depth psychoanalytic therapy would probably not be appropriate for Bobbie Carlton. He testified that the behavior modification type of service would be appropriate if Bobbie Carlton's urinary problem were dealt with satisfactorily but otherwise that the long-term type of psychological care would be needed. Supp. Record on Appeal, vol. I at 19. Elsewhere he testified that he believed Bobbie Carlton would need to undergo several revisions of her bladder implant device, thus indicating that he believed the device would not provide a satisfactory solution to the problem. Supp. Record on Appeal, vol. I at 21; 39–40. The $15,000 figure for the cost of Bobbie Carlton's future medical services was shown to a reasonable certainty.

Appellants also challenge the amount of future medicals awarded to Robert Carlton. They argue that damages for patella free-up and knee replacement operations were not shown to a reasonable certainty because Dr. Moore, the orthopedic surgeon, testified that Robert Carlton would probably end up with a knee fusion because the knee replacement was not likely to be a success.[13] We reject appellants' argument. The fact that Robert Carlton is likely to require an operation which would render his knee permanently stiff does not mean that it is not reasonably certain that Robert Carlton will undergo patella free-up and knee replacement operations. Dr. Moore's testimony is clear that Robert Carlton will need surgery

13. The patella free-up and knee replacement operations are intended to produce a functional knee with a range of motion. The knee fusion would produce a stiff knee capable of no motion. Supp. Record on Appeal, vol. I at 97–105.

on his left knee. A successful knee replacement operation offers a functional knee joint with movement; a successful knee fusion offers a permanently stiff knee. Even though Dr. Moore testified that he believed that Robert Carlton would probably need a fusion, he also testified that he was willing to perform the knee replacement operation and that he would not recommend that Robert Carlton undergo knee fusion and forego the knee replacement operation. Supp. Record on Appeal, vol. I at 114–115.

▮ We hold that each element of future medical expenses used by appellees' witness, Dr. Mayor, to arrive at the $91,544 figure for Bobbie Carlton and the $29,075 figure for Robert Carlton was shown to a reasonable certainty and that the trial court, accordingly, did not err in approving the award of damages for future medical expenses to the extent of $91,544 for Bobbie

Carlton and $29,075 for Robert Carlton. We also hold that $91,544 is the maximum amount for Bobbie Carlton supported by the evidence and that $29,075 is the maximum amount for Robert Carlton supported by the evidence. Accordingly, we remand for a new trial on the issue of future medicals only with respect to Bobbie Carlton unless she remits $38,456 ($130,000 minus $38,456 equals $91,544), and with respect to Robert Carlton unless he remits $30,925 ($60,000 minus $30,925 equals $29,075).[14]

## ATTORNEY'S FEES

▮ The last argument which we consider is that the district court erred in awarding attorney's fees in accordance with the statutory fee schedule provided under Alaska law.[15] The district judge clearly considered whether he should follow the statutory fee schedule.[16] He decided that

---

**14.** Our power to fix remittiturs is the same as that of the trial court. *Shingleton v. Armor Velvet Corp.*, 621 F.2d 180, 182 (5th Cir. 1980); *Stapleton v. Kawasaki Heavy Industries, Ltd.*, 608 F.2d 571, 574 n.7 (5th Cir. 1979); *Howell v. Marmpegaso Compania Naviera S.A.*, 536 F.2d 1032, 1035 (5th Cir. 1976). Moreover, as we said in *Davis v. Safeway Stores, Inc.*, 532 F.2d 489, 491 n.4 (5th Cir. 1976), "an appellate court that finds a verdict excessive may give plaintiff the choice between a new trial and a remittitur in a specified amount. [citation omitted]." *Accord, Stapleton v. Kawasaki Heavy Industries, Ltd.*, 608 F.2d at 574 n.7. In determining the amount of a remittitur, we are guided by the "maximum recovery rule" of this circuit which permits reduction of the verdict only to the maximum amount the jury could properly have awarded. *Keyes v. Lauga*, 635 F.2d 330 (5th Cir., 1981); *Bonura v. Sea Land Service, Inc.*, 505 F.2d 665 (5th Cir. 1974); *Gorsalitz v. Olin Mathieson Chemical Corp.*, 429 F.2d 1033 (5th Cir. 1970), *modified* 456 F.2d 180, *cert. denied* 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 87 (1972).

**15.** Rule 82. Attorney's Fees, reads in pertinent part as follows:

(a) Allowance to Prevailing Party as Costs. (1) Unless the court, in its discretion, otherwise directs, the following schedule of attorney's fees will be adhered to in fixing such fees for the party recovering any money judgment therein, as part of the costs of the action allowed by law:

ATTORNEY'S FEES IN AVERAGE CASES

| | Contested | Without Trial | Non-Contested |
|---|---|---|---|
| First $ 2000 | 25% | 20% | 15% |
| Next $ 3000 | 20% | 15% | 12.5% |
| Next $ 5000 | 15% | 12.5% | 10% |
| Over $10000 | 10% | 7.5% | 5% |

Should no recovery be had, attorney's fees for the prevailing party may be fixed by the court as a part of the costs of the action, in its discretion, in a reasonable amount.

(2) In actions where the money judgment is not an accurate criteria [sic] for determining the fee to be allowed to the prevailing side, the court shall award a fee commensurate with the amount and value of legal services rendered.

**16.** In its Findings of Fact and Conclusions of Law Concerning Post-Verdict Matters, the district court found:

1. This case was tried under a stipulation in which the Alaska rules concerning interest, costs and attorneys fees would be applicable. Alaska Rule 82(a) provides that: "Unless the court, in its discretion, otherwise directs, the following scheduled [sic] of attorneys [sic] fees will be adhered to in fixing such fees for the party recovering any money judgment therein ..." The Alaska cases seem to encourage the court to follow this schedule unless there are some special circumstances which would produce an inequitable result. In the event the court

he should and in accordance with the schedule, awarded $153,389.50 in attorney's fees.[17] Appellants argue that the award here is excessive, unconscionable and manifestly unreasonable. They argue that the amount of the verdict should not be used to determine the attorney's fees in this case because it was a simple case, liability was admitted and the damage award was large. They point out that the attorney's fees statute in paragraph 2 provides for deviation from the schedule and they cite cases in which the Supreme Court of Alaska has upheld a trial court's deviation from the schedule where the trial court has set forth its reasons for doing so. Finally, they argue that the court erred by applying the schedule to each specific award rather than to the money judgment as a whole.

As appellants concede, the determination of attorney's fees under Alaska law is left to the discretion of the trial court and the appellate court will interfere with the trial court's exercise thereof only on a showing of clear abuse. *State v. Alaska International Air, Inc.*, 562 P.2d 1064, 1067 (Alaska 1977); *Adoption of V.M.C.*, 528 P.2d 788, 795 (Alaska 1974). While appellants have cited cases in which appellate courts have upheld the trial court's determination to deviate from the attorney's fees schedule, they have cited no cases in which an appellate court has found that the trial court abused its discretion when it *followed* the

wishes to deviate from this schedule, he is required to prepare an order setting his reasons for deviating from this schedule. There can can [sic] be no question that the rule in this case does result in a very substantial award of attorneys fees. On the other hand, the rule in question does not authorize the court to award 'reasonable' attorneys fees or make a finding as to the amount of reasonable attorney's fees, but contemplates that the schedule set forth therein will be followed unless some special circumstances exist which would make following of Rule 82(a) seriously inequitable or would shock the conscience of the court. *In this case the* undersigned is not persuaded that the application of Rule 82(a)(1) produces inequitable or unfair results. The court, therefore, believes that a proper application of Alaska law will be to simply follow the pertinent portions of Rule 82(a)(1), and the judgment prepared in this case will so reflect.

Record on Appeal at 286–87.

17. A breakdown of the attorney's fees determined by the court appears as follows:

ATTORNEY'S FEES

| DAMAGE AWARDS | ATTORNEY'S FEES FIGURED BY APPLICATION OF THE SCHEDULE FOR CONTESTED CASES |
|---|---|
| 1. Bobbie Carlton – award for compensatory damages and future medicals: | |
| $682,700.00 | $ 1,850.00 |
| interest 78,893.84 | 75,159.38 * |
| TOTAL $761,593.84 | $ 77,009.38 |

(*$75,159.38 was arrived at in the following manner: .10 x ($761,593.84 – 10,000))

ATTORNEY'S FEES

| DAMAGE AWARDS | ATTORNEY'S FEES FIGURED BY APPLICATION OF THE SCHEDULE FOR CONTESTED CASES |
|---|---|
| 2. Robert Carlton – award for compensatory damages and future medicals: | |
| $615,000.00 | $ 1,850.00 |
| interest 71,072.32 | 67,607.23 * |
| TOTAL $686,072.32 | $ 69,457.23 ** |

(*$67,607.23 was arrived at in the following manner: .10 x ($686,072.32 – 10,000))

(** We note that the trial court actually awarded $69,457.03 in attorney's fees rather than $69,457.23. We explain the difference as mathematical error.)

| | | |
|---|---|---|
| 3. Combined award for compensatory damages and past medicals: | | |
| $ 59,370.00 | Attorney's fees at 10% = | |
| interest 6,860.89 | | |
| TOTAL $ 66,230.89 | $ 6,623.09 | |

| | | |
|---|---|---|
| 4. Punitive damages award | Attorney's fees at 10% = | |
| $ 3,000.00 | $ 300.00 | |
| TOTAL | $153,389.70 *** | |

(*** The total amount of attorney's fees actually awarded by the trial court was $153,389.50. The $.20 difference is explained above.)

schedule. It is clear in this case that the trial judge gave careful consideration to the attorney's fees issue. After a post-verdict hearing at which the issue was considered, the judge determined that it was proper to follow the attorney's fees schedule in this case.[18]

Having considered the arguments of the parties and reviewed the record, we are not prepared to hold that the trial judge abused his discretion under Alaska law in awarding attorney's fees in accordance with the fee schedule. While we, as a reviewing court, might have found it within his discretion had he decided to deviate from the schedule, we are not persuaded that he has abused his discretion by failing to do so.[19] We reject as unfounded appellants' claim that the trial judge misapplied the statutory fee schedule.[20] However, because our holding with respect to future medicals will change the attorney's fees produced by the schedule, we remand to the district court to make appropriate changes.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED WITH INSTRUCTIONS.

---

18. *See* n.16, *supra*, that sets out the judge's post-verdict findings of fact and conclusions of law, number 1, with respect to attorney's fees.

19. There are several factors which persuade us that the trial judge acted well within his discretion. We note first that liability was apparently never admitted until just prior to trial. Secondly, plaintiffs-appellees in this case had a contingent fee arrangement whereby they agreed to pay one-third of the total recovery as attorney's fees. Under Alaska law, the award of attorney's fees is intended to partially compensate the prevailing party for the costs of the litigation. *Adoption of V.M.C.*, 528 P.2d 788, 795 (Alaska 1974). The total award in this case, including interest, was in excess of $1.6 million dollars. The award of attorney's fees under the schedule in the amount of $153,-389.50 only partially compensates plaintiffs-appellees for their actual attorney's fees of approximately one-half million dollars. Because of the award, defendants-appellants will pay roughly one-third of the Carltons' attorney's fees. Finally, we observe that the Supreme Court of Alaska has approved application of the attorney's fee schedule where the resultant fee was even larger than that in this case. *See, e. g., Beech Aircraft Corp. v. Harvey*, 558 P.2d 879 (Alaska 1976) (award of $192,000 in attorney's fees under the Civil Rule 82(a) formula approved by the Supreme Court of Alaska).

20. Appellees explained at oral argument that the trial judge determined attorney's fees in the following manner: He applied the fee structure for contested cases with its higher percentage for the first $10,000 of the award to the compensatory and future medical damages award for Bobbie Carlton. He did the same with respect to the award of compensatory and future medical damages to Robert Carlton. With respect to the award for the stipulated past medical expenses and the award for punitive damages, he applied a 10% formula. Thus each plaintiff-appellee was awarded attorney's fees in the amount of 10% of his or her total damage award plus $850 for the first $10,000 of that award. We find no error in the court's application of the schedule.