**150**

Arceline M. VERDIN, individually as wife of/and as administratrix of the Succession of Albert Gail Verdin, Jr., Plaintiff–Appellee,

v.

C & B BOAT CO., INC., Defendant–Appellee.

FEDERAL BARGE LINES, INC., Defendant–Third Party Plaintiff–Appellant,

v.

MISSION INS. CO., Third Party Defendant–Appellee.

No. 87–3038.

United States Court of Appeals, Fifth Circuit.

Oct. 31, 1988.

As Amended Nov. 15, 1988.

Rehearing and Rehearing En Banc Denied Nov. 30, 1988.

James F. Shuey, LeMele, Kelleher, Kohl-meyer, Dennery, Hunley, Moss & Frilot, New Orleans, La., for defendant-third party plaintiff-appellant.

Joseph J. Weigand, Jr., Weigand, Weigand & Meyer, Houma, La., for Arceline M. Verdin.

André J. Mouledoux, Alan G. Brackett, New Orleans, La., for C & B Boat Co., and Mission Ins.

Before REAVLEY, KING and SMITH, Circuit Judges.

KING, Circuit Judge:

This appeal is from a verdict in the district court after a bench trial with an advisory jury awarding the plaintiff/appellee Arceline M. Verdin $346,950.00 from defendant/appellant Federal Barge Lines. The appellant argues 1) that the district court's fact-findings are clearly erroneous, 2) that in finding its vessel unseaworthy, the district court applied the wrong standard of care, 3) that it should be indemnified for any liability by defendant/appellee C & B Boat Co., Inc., 4) that it is entitled to limit its liability to the value of its ship, and 5) that the damages awarded the plaintiff are excessive.

## I. Factual Background

Albert Verdin, Jr. ("Verdin") died on April 1, 1984 as a result of the injuries he sustained when he fell into the cargo hopper of the Barge T–13022–B ("the barge") owned by Federal Barge Lines, Inc. ("FBL"). C & B Boat Company ("C & B") owns the M/V Mr. Earl, a towing vessel on which Verdin worked for C & B as captain. At the time of the injuries, Verdin was working in his capacity as captain of the Mr. Earl.

In the very early hours of March 27, 1984, Curtis Billiot, the mate aboard the Mr. Earl, received directions from a radio dispatcher to close the hatch covers on the barge to protect its cargo from the rain. Billiot went below and woke Verdin and Walter Folse, the ship's other crew member, to perform that operation. Verdin went aboard the barge with Folse, leaving Billiot at the wheel of the Mr. Earl. Billiot did not have a Coast Guard license to operate the vessel, nor had he any experience at the wheel in the maneuver involved in closing the barge's hatch covers.

The hatch covers on the barge weigh in excess of two tons and are set on tracks along which they roll open and closed. The barge has eight separate covers, four "high" and four "low". When the covers are open, the low covers are slid underneath the high covers. Adjacent high and low covers can never be completely separated from one another; a lip of metal on each end of the cover causes them to pull one another in telescope fashion. The covers are, of course, opened for loading and unloading the barge, and they must be closed to protect the cargo and/or the interior of the barge itself from rain.

To close the covers, the crew of the Mr. Earl had to pull its vessel alongside the barge, run a cable from the Mr. Earl, attach it to the cover, and then use the power of the boat to drag the cover along the rail. On this particular night, the crew successfully closed the covers on one end of the barge, but during efforts to close the covers on the other end, Verdin lost his balance and fell twelve to fifteen feet into the hopper of the barge. Verdin had been standing on top of one of the low hatch covers trying to lock it into place so that it would remain stationary when the adjacent cover was moved. The pulling cable from the Mr. Earl was attached to the adjacent high cover at the time, and Billiot, still at the wheel of the Mr. Earl and mistakenly thinking all was clear, opened the throttle. The force caused not only the high cover to which the cable was attached, but also the adjacent low cover on which Verdin was standing, to move. The motion caused Verdin to fall.

The factual dispute in this case centers around whether the barge had adequate safety devices to lock an individual hatch cover into place so that it would not move inadvertently when the other covers around it were being moved. At the core is whether the barge's lack of securing devices was a legal cause of Verdin's accident.

## II. Procedural History

Arceline Verdin ("plaintiff") filed suit on behalf of herself, her minor daughter and the succession of Albert Verdin, Jr. for the death of her husband, Albert Verdin, Jr. She named as defendants C & B and FBL. The claims against C & B were under both

the Jones Act, 46 U.S.C.App. § 688, and under general maritime law. The claims against FBL were brought under general maritime law for negligence and the unseaworthiness of the barge. Both C & B and FBL cross-claimed against the other seeking indemnity, the former alleging a breach of the duty to provide a seaworthy vessel, the latter alleging a breach of the warranty of workmanlike performance.

After the first day of a jury trial, the plaintiff settled her claims against C & B, in a "Mary Carter" agreement.[1] Because the Jones Act claim against C & B was the only claim in the suit permitting a jury determination, the court had the option of either retaining the jury in an advisory capacity or dismissing it.[2] The parties agreed to retain the impaneled jury in an advisory capacity under Federal Rule of Civil Procedure 39(c) and continued with the trial. After four days of testimony from the two eyewitnesses to the accident and numerous expert witnesses, the advisory jury deliberated and returned its verdict finding Verdin, C & B and FBL negligent, finding both the Mr. Earl and the barge to be unseaworthy, but finding FBL's negligence and the unseaworthiness of its barge

not to be legal causes of Verdin's injury.[3] The court in its findings adopted the findings of the advisory jury, except it found FBL's negligence and the unseaworthiness of the barge to be legal causes of Verdin's death.

The advisory jury also found that the total amount the plaintiff should recover was $1,156,500.00. The district court agreed with this amount and also agreed with the jury's apportionment of fault: C & B 60 percent, FBL 30 percent, and Verdin 10 percent. The court held FBL liable to the plaintiff for 30 percent of the total award, or $346,950.00, plus prejudgment interest. FBL appeals this result arguing five main points: 1) the factual findings of the district court were clearly erroneous; 2) FBL did not owe a duty of seaworthiness to Verdin because at the time of his injury he was engaged in stevedoring work; 3) FBL is entitled to *Ryan* indemnity from C & B; 4) FBL's liability is limited to the value of the Barge T–13022–B at the time of the accident; and (5) the amount awarded to the plaintiff is excessive, and prejudgment interest is not available for an award of future damages.

....

7. Do you find from a preponderance of the evidence that Federal Barge Lines, Inc. was negligent under the general maritime law? Answer "Yes" or "No".
Answer Yes

....

8. Do you find from a preponderance of the evidence that Federal Barge Lines' negligence was a legal cause of plaintiff's accident? Answer "Yes" or "No".
Answer No

....

11. To what extent, if any, were Albert Verdin's injuries and death caused by C & B Boat Company, Inc., Federal Barge Lines, and/or Albert Verdin. Answer in terms of a percentage.

C & B Boat Company, Inc .....................60%
Federal Barge Lines, Inc. ....................30%
Albert Verdin .............................10%

We note that the advisory jury's findings are not internally consistent. That is, even though it found that FBL was not a legal cause of Verdin's accident, it assigned 30 percent of the blame to FBL.

---

1. The plaintiff agreed to indemnify C & B in the event that FBL's cross-claim succeeded. Therefore, once this settlement had been reached, the interests of C & B and the plaintiff were aligned.

2. *In re Incident Aboard the D/B Ocean King,* 758 F.2d 1063, 1070 (5th Cir.1985) (in case involving both Jones Act and maritime claims, when Jones Act claims are dismissed, the court should dismiss the jury or retain it in an advisory capacity only); *Durden v. Exxon Corp.,* 803 F.2d 845, 848 (5th Cir.1986) (trial court properly took for its own determination remaining maritime claims after Jones Act claims were dismissed).

3. The findings relevant to FBL, and therefore to this appeal were as follows:

5. Do you find from a preponderance of the evidence that Federal Barge Lines, Inc.'s Barge T–13022 was unseaworthy at the time of Albert Verdin's accident. Answer "Yes" or "No".
Answer Yes

....

6. Do you find from a preponderance of the evidence that Federal Barge Lines, Inc's Barge T–13022's unseaworthiness was a legal cause of Albert Verdin's injury. Answer "Yes" or "No".
Answer No

### III. Was the District Court Clearly Erroneous?

■ FBL argues that the findings that it was negligent, that its vessel was unseaworthy, and that this negligence and unseaworthiness were legal causes of the Verdin's death are clearly erroneous. It argues most strenuously the causation issue, and it points out that even the advisory jury failed to find that either FBL's negligence or the unseaworthiness of its vessel were legal causes of Verdin's death.

First, we note that the clearly erroneous standard is the appropriate standard of review for these fact findings. *Inland Oil and Transport Co. v. Ark–White Towing,* 696 F.2d 321, 325 (5th Cir.1983) (finding of negligence and apportionment of fault in maritime personal injury case reviewed on a clearly erroneous standard); *Todd Shipyards v. Turbine Service, Inc.,* 674 F.2d 401, 405 (5th Cir.), *cert. denied,* 459 U.S. 1036, 103 S.Ct. 447, 448, 74 L.Ed.2d 602, 603 (1982) (findings of the existence of negligence and proximate causation in an admiralty case are subject to the clearly erroneous standard). Further, an advisory jury's findings are in no way binding on the court, and the fact that the district court's ultimate findings are not entirely consistent with those of the advisory jury gives no added weight to FBL's contention of clear error. *Frostie v. Dr. Pepper Co.,* 361 F.2d 124, 126 (5th Cir.1966).

In much-quoted language, the Supreme Court gave content to the clearly erroneous standard of Federal Rule of Civil Procedure 52(a) in *Anderson v. Bessemer City:* "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that it had been sitting as the trier of fact, it would have weighed the evidence differently." 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). FBL disputes the district court's factual findings by pointing to testimony contrary to each of the adverse findings. We must, however, follow the dictate of *Anderson* and look to the record as a whole. While all of the evidence presented at trial does not support the conclusions reached by the court below, none of its conclusions is unsupported by the evidence. We refuse to hold, after a thorough review of the record, that the district court's account of the evidence is implausible.

The district court reached its factual conclusions and discharged the difficult task of assigning fault in this case after four days of testimony which often conflicted. It found as uncontested that the barge was not equipped with cover-securing devices—called safety chains—in working order, that the Mr. Earl's pulling cable was not attached to the hatch cover on which Verdin was standing at the time of his fall, and that there had been no reason to expect the cover on which Verdin stood to move. It found further that the lack of a securing device for the low covers, operable at deck level, rendered the barge unseaworthy and unfit for its intended use. Finally it found this unseaworthiness to be a cause of Verdin's injuries because it created a need for Verdin to get on top of the hatch covers in the first place. That is, if the safety chains and hooks had been operable, Verdin would have stayed on the deck.[4]

FBL disputes the finding that it was a cause of the accident in two ways. First, it argues that even had the safety chains been operable they would not have prevented the accident because they were not designed to withstand a force such as that applied by the Mr. Earl. Even if we accept this as true, it does not compel the conclusion that the district court's finding was clearly erroneous. The finding of causes is based on the barge's lack of deck-level securing devices which created a need for Verdin to climb up on the cover in the first place. Whether the cover would have been

---

4. The record is replete with testimony regarding the different devices used on this barge to secure its hatchcovers. Two types of locking devices were present in varying states of repair. The high hatch covers were locked in place with "dagger pins," strips of metal attached to the side of the cover which fit into metal loops attached to the side of the barge. The low hatch covers had no such device; they did, however, have "safety chains" which were used to create a rain seal when the covers were closed.

secured by a functional safety chain is not the issue; rather, the issue is whether FBL's negligent failure to repair or the unseaworthiness of its barge created the necessity for Verdin to put himself in the dangerous position. Second, FBL argues that there is nothing inherently dangerous about climbing atop the hatch covers, and therefore the mere need to do so cannot be construed as a cause of the accident. FBL contends that nothing about the condition of the barge prevented the hatch-closing operation from being carried out safely. It cites as evidence for this contention that the covers on the other end of the barge had been closed without incident. However, there is testimony in the record that climbing on an *unsecured* hatchcover is dangerous, and the district court concluded that the condition of the barge required a crew member to climb on an unsecured cover.

We note also that many of FBL's arguments seem to disregard the finding that C & B was 60 percent responsible for Verdin's injuries. FBL complains that the acts of negligence on the part of the crew of the Mr. Earl are the legal cause of the accident for which FBL has no responsibility. Surely it is not necessary for this court to point out that there can be more than one legal cause of an accident. The fact that C & B's vessel was unseaworthy and its crew negligent does not necessarily preclude the conclusion that FBL's negligence and the unseaworthiness of its vessel also caused the accident.

### IV. What Duty did FBL Owe to Verdin?

■ FBL argues that the work Verdin was engaged in at the time of his accident was that of a stevedore, and therefore § 905(b) bars recovery for a breach of the warranty of seaworthiness. *Burks v. American River Transp. Co.*, 679 F.2d 69 (5th Cir.1982). The appellees counter (and FBL concedes) that this argument was never made before; it is urged for the first time on appeal. This court will not entertain issues not raised in or decided by the district court absent extraordinary circumstances. *Singleton v. Wulff*, 428 U.S. 106,

120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); *Thomas v. Capital Sec. Services*, 836 F.2d 866, 884 n. 25 (5th Cir.1988) (en banc). Such extraordinary circumstances exist when the issue involved is a pure question of law and a miscarriage of justice would result from our failure to consider it. *Martinez v. Mathews*, 544 F.2d 1233, 1237 (5th Cir.1976). Such extraordinary circumstances do not exist here. Given that FBL was found negligent by the district court as well as in breach of its warranty of seaworthiness, we see no chance that justice would be miscarried by our failure to decide this issue. Moreover, because the issue involves some underlying facts regarding Verdin's status at the time of his injury, a miscarriage of justice would more likely result if we were to engage in appellate fact-finding as FBL implicitly invites us to do.

### V. Is FBL Entitled to *Ryan* Indemnity from C & B?

■ FBL urges us to breathe new life into the doctrine of *Ryan* indemnity. In *Ryan Stevedoring Co., Inc. v. Pan–Atlantic Steamship Corp.*, the Supreme Court held that a shipowner who had been held liable to a longshoreman for the unsafe storage of cargo under the doctrine of seaworthiness was entitled to full indemnity from the seaman's employer if the seaman had been negligent. The theory is that when a shipowner contracted for stevedoring work, implied in the contract is a warranty of workmanlike performance ("WWLP") which is breached by the stevedore's negligence. 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). The Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972 introduced changes with respect to stevedores, and eliminated *Ryan* indemnity where the plaintiff recovers under the Act. Longshore and Harbor Workers' Compensation Act Section 5, 33 U.S.C. § 905. However, we have applied the doctrine in many contexts not involving stevedores. See *Stevens v. East–West Towing Co., Inc.*, 649 F.2d 1104, 1109 n. 7 (5th Cir.1981), *cert. denied*, 454

U.S. 1145, 102 S.Ct. 1007, 71 L.Ed.2d 298 (1982) (and cases cited therein).

We have called into question the continuing vitality of *Ryan* indemnity in a case such as this one in which there was concurrent negligence on the part of the vessel owner. *Bass v. Phoenix Seadrill/78, Ltd.*, 749 F.2d 1154 (5th Cir.1985). In *Bass*, the plaintiff was injured in the course of his employment on an offshore drilling rig. He sued his employer, the designer and builder of the rig's derrick, and the erector of the derrick for damages based on the injuries he sustained. Before trial, Bass entered into a settlement agreement with his employer, but continued to prosecute the claim against the two other defendants. The district court found concurrent negligence on the part of all three of the original defendants and denied the employer's claim of *Ryan* indemnity against the other two. We affirmed the district court, holding that

> This is not a classic *Ryan* case in which a vessel owner, by entrusting his vessel to a contractor who rendered the vessel unseaworthy, has been subject to absolute liability without directly contributing to the unseaworthy condition that caused the accident. Instead, we are faced with an accident that was proximately caused the concurrent negligence of a designer who supplied an inadequate part, an erector who did not adequately inspect that part, and a vessel owner who operated the vessel in a negligent manner that accelerated the failure of that part.... [the employer's] conduct is clearly sufficient to preclude *Ryan* indemnity.

*Bass*, 749 F.2d at 1169. While we do not doubt, as FBL argues, that *Ryan* still has valid application in some cases not involving workers covered by the LHWCA, *Bass* has clearly ruled out its application here. The district court found that FBL was negligent and its negligence was 30 percent responsible for Verdin's injuries. Just as in *Bass*, the "classic *Ryan* case" is not before us here. The vessel owner here is *not* free from fault, and therefore the concerns of *Ryan*, that the burden imposed by the warranty of seaworthiness was too

great on an innocent shipowner, are simply not raised here.

## VI. Is FBL's Liability Limited to the Value of the Barge?

FBL argues that its liability for the losses sustained by the plaintiff should be limited to the value of its vessel. Under 46 U.S.C.App. § 183(a), a shipowner's liability is limited to the ship's value under certain circumstances. Under this provision, the loss must have been incurred "without the privity or knowledge of such owner." The burden of proof is on the shipowner to prove lack of privity or knowledge of the negligent or unseaworthy condition. *In re Complaint of Patton–Tully Trans. Co.*, 797 F.2d 206, 211 (5th Cir. 1986). Further, in the case of a corporate vessel owner such as FBL, the question is not what the vessel owner actually knew, but what it should have known. *Id.* The district court found that the safety chains had not been repaired for over two years and that some of the dagger pins on the high covers could not function. The court also noted that all of the experts agreed that FBL should inspect the barge on a regular basis and that items such as the dagger pins and safety chains should be kept in working order. This failure of FBL to maintain the safety chains was, according to the district court's findings, a continuing act of negligence. Taken together, these findings lead us to only one conclusion: That FBL at the very least should have known of the condition of the safety chains. Because of this constructive knowledge, the protection of 46 U.S.C.App. § 183 is unavailable to FBL.

## VII. Are the Damages Awarded Excessive?

FBL argues that the damages awarded here are excessive. The plaintiff counters by saying that FBL's failure to move for a new trial or remittitur below precludes our review of the award on appeal. While it is true that a court of appeals cannot review a jury award of damages as excessive or inadequate without a

trial court ruling on remittitur,[5] such a ruling is unnecessary when the damages were decided by the court itself rather than a jury. 6A Moore's Federal Practice ¶¶ 59.-07, 59.08(7); *see also, Carlton v. H.C. Price Co.*, 640 F.2d 573, 577 (5th Cir.1981). The presence of the advisory jury does not change the reasoning since the ultimate determination remained the responsibility of the trial judge. *Id.* Having decided that we can review the award of damages here, we note that the trial court's determination of damages is "shielded against reversal unless 'clearly erroneous.'" *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 783 (5th Cir.1983).

FBL attacks six separate aspects of the damage award. We address each of them.[6]

■ First, FBL argues that the award for loss of future support is clearly erroneous because it was unsupported by competent evidence. The plaintiff's own expert, FBL points out, set the present value of the decedent's lost future earnings at $347,123, basing the projection on an annual salary of $21,340. FBL's expert estimated that the loss fell within the range of $168,781 to 238,710, using an annual salary of $19,620.[7] The award of $425,000 exceeds both of those estimates. We find, however, that the award is support by the evidence. Neither expert contested that in 1981 Verdin's salary was over $30,000, more than $10,000 higher than the base salaries they used in their projections. The jury and the judge could have reasonably used the higher salary to make an estimate of lost future support which would have been higher than $425,000. Therefore, we fail to find clear error in this aspect of the damage award.

■ FBL also disputes the award for loss of future services in the amount of $40,000. First it argues that there is no evidence in the record that Verdin performed any household services for which this award would be recompense. However, the plaintiff did testify that her husband had worked around the house, built things and performed yard work. No testimony, expert or otherwise, was adduced as to the value of such services. The plaintiff's expert did testify that Verdin's life expectancy from the date of his accident would have been about 46 years (this is distinguishable from his work life expectancy on which the experts based their opinions of Verdin's lost future earnings). The jury or judge, from its own experience, could conclude that the kinds of services Verdin performed around the house were of the types ordinarily compensable at the minimum wage, which was $3.35 at the time of trial. From the plaintiff's testimony, and taking into account the evidence of Verdin's frequent absences necessitated by his employment, the jury or judge could reasonably estimate that Verdin spent approximately ten hours a month performing those tasks. At the minimum wage, then, the value of those services would be $402.00 per year. Applying the same discount rate as applied by the plaintiff's ex-

---

**5.** *Bueno v. City of Donna*, 714 F.2d 484, 493–94 (5th Cir.1983).

**6.** The court found that the total amount awarded by the advisory jury was within reason and adopted its finding as its own. The advisory jury's damages assessment was as follows:

1. Arceline M. Verdin, as Succession Representative

(a) Loss of love, affection, companionship and protection, if any, to Arceline M. Verdin ............................$250,000

(b) Loss of services, if any ...............$ 40,000

(c) Past loss of support, if any ...........$ 30,000

(d) Future loss of support, if any .........$425,000

(e) Loss of love, affection, companionship and protection, if any, to Angie Maria Verdin ............................$250,000

(f) Loss of nurture, guidance and training, if any, to Angie Maria Verdin ........$ 75,000

2. Succession of Albert Gail Verdin, Jr.
(Survival Action)

(a) Pain and suffering of decedent from date of injury to date of death, if any   $ 50,000

(b) Medical or funeral expenses, if any ....$ 36,500

**7.** The estimates from both experts were within the prescriptions on future damages of this circuit. Both experts adjusted their predictions for inflation according to the below market discount rate as set out in *Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir.1983) (en banc), *cert. denied*, 467 U.S. 1252, 104 S.Ct. 3537, 82 L.Ed.2d 842 (1984), and both accounted for the diminishing profitability of the industry in which Verdin was employed at the time of his death.

pert in calculating future income, three percent, to the amount of $402.00 per year for 46 years, we arrive at a figure of $9,959.73. An award substantially higher than this would have to be based on evidence (not tendered here) of a value of Verdin's services in excess of what a jury or judge would be familiar with.

▮ FBL urges us also to reconsider the award for loss of nurture, guidance and training to the decedent's minor child. It argues that the district court's award of $75,000 for this item far exceeds any prior awards approved by this circuit for this injury. This court in *De Centeno v. Gulf Fleet Crews, Inc.*, 798 F.2d 138 (5th Cir. 1986), in the face of remarkably similar circumstances determined that $2000 per year for the period of minority of the child adequately compensated for the loss.[8] We agree that $2000 is a reasonable sum, and therefore calculate the award of $2000 per year for 18 years, discounted at three percent, to arrive at the figure of $27,507.03.

▮ FBL argues that the amount of the medical expense award is excessive because the testimony indicated that all bills had been paid by C & B. However, since FBL was found 30 percent responsible for the injuries, and the agreement between the plaintiff and C & B provides for the indemnity of the latter at the end of this lawsuit, the fact that C & B may have already paid the expenses does not preclude the award here. That is, FBL remains liable to C & B for 30% of the medical and funeral expenses, even if there is no amount owed to the plaintiff.

▮ As for the award of damages for Verdin's pain and suffering prior to his death, FBL argues that there was no evidence to support the district court's finding of consciousness and therefore no grounds on which to base the award. We find to the contrary. The record contains evidence that immediately after the fall, Verdin was found conscious and complaining of head pain. There was substantial testimony at trial from Verdin's attending physicians to the effect that Verdin was conscious upon arriving at the hospital; Verdin could move his extremities, spoke his first name when asked, and became combative when asked to cooperate with certain tests. Given that there is evidence to support the district court's finding of consciousness, we only must review the amount awarded for reasonableness. "Any amount to be awarded for pain and suffering must necessarily depend to a great extent on the trial court's observations." *Gulf Coast Indus. Workers' Union v. Exxon*, 712 F.2d 161 (5th Cir.1983). We agree with the district court's assessment of those damages, and we refuse to disturb the amount of $50,000.

▮ Finally, FBL points out that the district court did not divide the award between damages compensating the plaintiff for past injuries and those compensating her for future injuries for the purposes of awarding prejudgment interest. We have held on numerous occasions that awards of prejudgment interest on future damages are not available, for the common-sense reason that those damages compensate *future* harm, for which no interest could possibly have accrued before trial.[9] We therefore allow prejudgment interest on only those measures of damages which are for past harms. These are the following: past loss of support, pain and suffering of the decedent, and medical and funeral expenses.

## VIII. Conclusion

We affirm the district court in all respects except for the amount of damages awarded. We remand to the district court for the entry of a judgment on damages in an amount consistent with this opinion. AFFIRMED IN PART and REMANDED IN PART. Costs shall be borne by FBL.

---

8. In *De Centeno,* as here, the decedent was a crewmember aboard a vessel and therefore only home about one-quarter of the time.

9. See e.g., *Martin v. Walk, Haydel & Assoc.,* 794 F.2d 209, 212 (5th Cir.1986); *Williams v. Reading & Bates Drilling Co.,* 750 F.2d 487, 491 (5th Cir.1985).

PER CURIAM:

Our opinion in this case, released on October 31, 1988, is modified as follows. In Part VI of the opinion, the fifth sentence is amended to read as follows:

Further, in the case of a corporate vessel owner such as FBL, the question is not what the vessel owner actually knew, but what, from the standpoint of management, it should have known.

The ninth sentence of the same paragraph is amended to read as follows:

Taken together, these findings lead us to only one conclusion: That FBL, from the standpoint of management, at the very least should have known of the condition of the safety chains.