Bob **SPRINGBORN**, Plaintiff-Appellee, Cross-Appellant,

v.

**AMERICAN COMMERCIAL BARGE LINES, INC., et al.,** Defendants-Appellees,

**Inland Tugs Company,** Defendant-Appellant, Cross-Appellee.

No. 83–3692.

United States Court of Appeals, Fifth Circuit.

July 18, 1985.

Before CLARK, Chief Judge, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, HILL and JONES, Circuit Judges.

Garwood, Circuit Judge, filed specially concurring opinion.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Fred E. Salley, George R. Alvey, Jr., New Orleans, La., for defendant-appellant, cross-appellee.

R. Layne Royer, Baton Rouge, La., for appellees.

Before BROWN, WILLIAMS, and GARWOOD, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This is an appeal from a judgment awarding maintenance and cure to Bob Springborn and his cross-appeal from a judgment denying his claims under the Jones Act, 46 U.S.C. § 688, and for unseaworthiness. We conclude that the jury's award for maintenance and cure was excessive, not supported by the evidence, and reverse and remand. We affirm the jury's determination that there was no negligence or unseaworthiness.

### How it All Began

Bob Springborn was the lead deckhand aboard the tug, M/V TOM FRAZIER owned by American Commercial Lines, Inc. The tug was pushing a string of 15 barges[1] owned by American Commercial Barge Lines Co. (ACBL)[2] up the Mississippi River. The barges were placed three across and five deep.

Deckhands, Bob Springborn and Tracy Asher, came on watch at midnight, June 29, 1981. Springborn, as lead deckhand, was required to periodically check water pumps on some of the barges.[3] At 2:30 a.m. he was returning from an inspection and fell from hopper barge #1819 onto another barge. Asher proceeded from the tug to the barge and helped Springborn back to the wheelhouse. Springborn testified that he did not know what caused him to fall. Asher testified that there was a puddle of oil in the area—although there were no skid marks in it—and no oil on Springborn's clothes or shoes. Asher also stated that he did not know whether there were water pumps at that particular site. Springborn, complaining of pain in his back and left knee, was discharged the following day at the next port. He was hospitalized for one week under the care of Dr. Charles Cannon in Philadelphia, Mississippi.[4] On July 27, 1981, Springborn saw Dr. Gernon Brown in New Orleans who recommended conservative treatment. He determined that there was a narrowing of the lumbosacral disc, indicative of degenerative disc disease,[5] a soft tissue injury,[6] but that there was no disc herniation. On November 2, 1981, Springborn saw Dr. Dabezies in New Orleans.[7] Dr. Dabezies found that Springborn suffered from a low back sprain superimposed on his degenerative disc, but that there was no indication for surgery. He instructed Springborn to be treated by Dr. Abangan who had operated

---

1. Some of the barges were loaded and others were empty.

2. American Commercial Barge Lines Co. and Inland Tugs Co. are wholly owned subsidiaries of American Commercial Lines, Inc.

3. Apparently it rained before June 29 and due to the accumulation of water, the barges needed pumping. Because of the procedures used in adding oil to the waterpumps, there was some potential for oil spillage although there was no testimony that this actually occurred at the site.

4. Dr. Cannon did not operate on Springborn but recommended a corset to support his back.

5. Dr. Brown further testified that the narrowing of the disc was of long standing.

6. Springborn had been injured while working for a different employer and underwent surgery in March, 1976, for a herniated disc—lumbar 5, sacral 1.

7. Dr. Dabezies was tendered by defendants.

on him for a herniated disc in 1976.[8] On February 2, 1982, Springborn saw Dr. Kenneth Vogel in New Orleans. On March 16, 1982, Dr. Vogel admitted Springborn to Mercy Hospital and performed a discogram on him on March 17. On March 19, Dr. Vogel performed a percutaneous discectomy on Springborn. Springborn was released from the hospital on March 23, 1982.

Springborn brought suit against ACBL for Jones Act negligence and for maintenance and cure under the general maritime law. ACBL answered denying that it was Springborn's employer; subsequently Springborn filed an amended complaint against Inland Tugs Co., Springborn's employer and operator of the tug M/V TOM FRAZIER, and against American Commercial Lines,Inc., owner of the tug M/V TOM FRAZIER.[9] Springborn sought damages for negligence, unseaworthiness, and maintenance and cure against Inland Tugs. He also alleged that barge #1819 was unseaworthy.

Springborn asserted that his employer, Inland Tugs, was negligent in failing to provide: (i) a safe place to work, (ii) proper supervision, (iii) proper equipment, and (iv) a full crew. He claimed that the tug was unseaworthy because she did not have a full crew[10] to perform the work required, did not have proper equipment to prevent oil spillage, and was manned by an untrained crew. Springborn alleged that barge #1819 was unseaworthy due to an oil spill that remained on its deck. Springborn sought maintenance from December 7, 1981, through March 22, 1982, and from June 1, 1982, to the date of the trial. Additionally, he claimed that Inland Tugs arbitrarily refused to pay maintenance and cure, thus entitling him to punitive damages and attorney's fees.

Trial was before a six member jury. In its answers to sixteen precise interrogatories,[11] the jury, as to claims for compensatory damages, held Inland Tugs not negligent, the tug M/V TOM FRAZIER seaworthy, barge #1819 seaworthy, Springborn 50% contributorily negligent and awarded no compensatory damages. The jury did find, however, that Springborn was entitled to maintenance and cure, fixed the amount at $75,000. The jury also found that there was no willful, unreasonable failure to pay maintenance and cure. While it is the jury's maintenance and cure finding that is primarily in dispute before us, Springborn also challenges the failure to find unseaworthiness and negligence.

---

**8.** Dr. Dabezies suggested that Springborn see Dr. Abangan because Dr. Abangan's office was closer to Springborn's home in Philadelphia, Mississippi than Dr. Dabezies' office in New Orleans.

**9.** *See supra* note 2.

**10.** Apparently one crew member became ill and left the tug before the accident occurred.

**11.** We have repeatedly urged the use of special interrogatories. *Smith v. Shell Oil Co.,* 746 F.2d 1087, 1092 (5th Cir.1984);
*Ware v. Reed,* 709 F.2d 345, 355 (5th Cir. 1983); *Wood v. Diamond M Drilling Co.,* 691 F.2d 1165 (5th Cir.1982); *J.C. Motor Lines, Inc. v. Trailways Bus System, Inc.,* 689 F.2d 599 (5th Cir.1982); *Jones v. Miles,* 656 F.2d 103, 106 n. 3 (5th Cir.1981); *Guidry v. Kem Mfg. Co.,* 598 F.2d 402, 403, 405–06 (5th Cir. 1979); *Nardone v. Reynolds,* 538 F.2d 1131, 1137 n. 16 (5th Cir.1976); *reh'g denied,* 546 F.2d 906 (1977); *Jamison Co. v. Westvaco Corp.,* 526 F.2d 922, 934–35 (5th Cir.) *reh'g denied,* 530 F.2d 34 (1976); *Kestenbaum v. Falstaff Brewing Corp.,* 514 F.2d 690, 693–94 (5th Cir.1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976); *Simmons v. King,* 478 F.2d 857, 862 n. 12 (5th Cir.1973); *Burns v. Anchor-Wate Co.,* 469 F.2d 730, 734 n. 8 (5th Cir.1972); *In re Double D Dredging Co.,* 467 F.2d 468, 469 (5th Cir.1972); *Bailey v. Kawasaki-Kisen, K.K.,* 455 F.2d 392, 394 (5th Cir.1972). *See generally Brown, Federal Special Verdicts: The Doubt Eliminator,* 44 F.R.D. 338 (1967).
Special interrogatories are helpful for appellate review because they avoid the "inscrutable mystery of a general verdict...." *Tugwell v. A.F. Klaveness & Co.,* 320 F.2d 866, 868, n. 2 (5th Cir.1963), *cert. denied,* 376 U.S. 951, 84 S.Ct. 967, 11 L.Ed.2d 970 (1964). Unfortunately, having used detailed interrogatories, the trial court did not go far enough. Interrogatories 11 and 12 were in conclusory terms holding Springborn entitled to maintenance and cure and fixing the amount in the lump sum of $75,000. Separate interrogatories inquiring as to the rate of maintenance per day and the duration would have provided a surer foundation for review.

**94**

### *Food, Lodging, Candlelight, and a Woman*[12]

The jury awarded Springborn $75,000 for maintenance and cure. Although this finding necessarily contemplated an award for cure (approximately $13,000 including travel expenses)[13] we must determine whether the verdict for maintenance alone was adequately established.

In the trial court, Inland Tugs moved for a j.n.o.v., new trial, or remittitur contending that the $75,000 maintenance and cure award was excessive and unsupported by the evidence. Inland Tugs asserts that the district court erred as a matter of law in failing to grant the motion for j.n.o.v. and for remittitur because Springborn failed to prove an appropriate maintenance rate. Our standard of review for a j.n.o.v. was established in *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir.1969) (en banc); *see also Smith v. Shell Oil Co.*, 746 F.2d 1087, 1091 (5th Cir.1984); *Maxey v. Freightliner Corp.*, 665 F.2d 1367, 1371 (5th Cir.1982) (en banc). In *Boeing* we made clear that a motion for j.n.o.v. should be granted only when the facts and inferences point so strongly and overwhelmingly in favor of a moving party that reasonable persons could not arrive at a contrary verdict.

■ The standard for reviewing such motions is the same in the trial court and on appeal. *Harwood & Associates, Inc. v. Texas Bank & Trust*, 654 F.2d 1073, 1076 (5th Cir.1981 Unit A). Ambiguities and doubts are to be resolved in favor of the seaman. *Vaughn v. Atkinson*, 369 U.S. 527, 532, 82 S.Ct. 997, 1000, 8 L.Ed.2d 88, 92, 1962 A.M.C. 1131 (1962); *Wood v. Dia-* *mond M Drilling Co.*, 691 F.2d 1165, 1171, 1983 A.M.C. 2959, 967 (5th Cir.1982), *cert. denied*, 460 U.S. 1069, 103 S.Ct. 1523, 75 L.Ed.2d 947 (1983).

■ We affirm the district court's denial of the motion for j.n.o.v. on the issue of the rate of maintenance because the evidence was sufficient to create a question for the jury under the *Boeing* standard. There is an ancient duty of a vessel to provide maintenance and cure to a seaman who is injured or falls ill while in the service of the ship. *The OSCEOLA*, 189 U.S. 158, 175, 23 S.Ct. 483, 487, 47 L.Ed. 760, 764 (1903); *see generally*, Ravkind, *More on Maintenance*, 24 S.Tex.L.J. 533 (1983). Maintenance is comparable to the value of food and lodging provided by the vessel. *Calmar Steamship Corp. v. Taylor*, 303 U.S. 525, 528, 58 S.Ct. 651, 653, 82 L.Ed. 993, 997, 1938 A.M.C. 341, 343 (1938); *Morel v. Sabine Towing & Transp. Co.*, 669 F.2d 345, 346, 1984 A.M.C. 1318, 1319 (5th Cir.1982); *Tate v. American Tugs, Inc.*, 634 F.2d 869, 870, 1981 A.M.C. 2826, 2827 (5th Cir.1981); *see also* Norris, *The Law of Seamen*, § 572 at 90 (1970) (maintenance while being cured takes the place of the seaman's sustenance on the ship). A seaman's own testimony as to expenses is competent evidence of the amount of maintenance. *Harper v. Zapata Off-shore Co.*, 741 F.2d 87, 91 (5th Cir.1984); *Caulfield v. AC & D Marine, Inc.*, 633 F.2d 1129, 1132–33, 1982 A.M.C. 1033, 1037 (5th Cir.1981). Since the maintenance payment is for food and lodging similar to that aboard the vessel, the amount may vary depending on what was provided by the ship and the cost of the equivalent shoreside. *Tate*, 634 F.2d

---

**12.** Article VII of the Laws of Oleron, reprinted in 30 F.Cas. at 1171, 1174 (1897) provides:

> If it happens that sickness seizes on any one of the mariners, while in the service of the ship, the master ought to set him ashore, to provide lodging and candlelight for him, and also to spare him one of the ship-boys or hire a woman to attend him, and likewise to afford him such diet as is usual in the ship; that is to say, so much as he had on shipboard in his health, and nothing more, unless it please the master to allow him; and if he will have better diet, the master shall not be bound to provide it for him unless it be at the mariner's own cost and charges; and if the vessel be ready for her departure, she ought not stay for the said sick party—but if he recover, he ought to have his full wages, deducting only such charges as the master has been at for him. And if he dies, his wife or next kin shall have it.

> This code was originally promulgated by Eleanor, Duchess of Guienne, mother of Richard I of England. *See* commentary preceding the code, 30 F.Cas. at 1171.

**13.** The cure of $13,000 is not in dispute.

at 870, 1981 A.M.C. at 2827. Thus, it is a question of fact to be decided based upon the evidence presented. *Id.*

■ At trial, the only testimony provided by Springborn concerning maintenance was Springborn's statement that he borrowed $200 a week from his attorney. Springborn argues that this is competent evidence and supports the jury's award. Additional testimony came from Inland Tugs' claims adjuster who was examined by Springborn's attorney as a hostile witness. His testimony was that Springborn was receiving maintenance at the rate of $14 a day. We conclude that Springborn's mere assertion that he borrowed $200 a week from his attorney to live on is not enough. The seaman must present some evidence that he expended sums for food and lodging ashore which was the equivalent of that on the vessel. Maintenance is limited to seamen who actually incur expenses for their support. Thus, when maintenance is provided by parents or relatives or during hospitalization, no maintenance need be paid by the vessel. *See, e.g., Johnson v. United States,* 333 U.S. 46, 50, 68 S.Ct. 391, 394, 92 L.Ed. 468, 473, 1948 A.M.C. 218, 221 (1948); *Calmar,* 303 U.S. at 531, 58 S.Ct. at 654, 82 L.Ed. at 998, 1938 A.M.C. at 346 (1938). Without some indication of Springborn's expenses, an award is not appropriate. However, the testimony of the claims adjuster that $14 per day was paid for the maintenance of the seaman was some evidence to support a maintenance award. *See Harper,* 741 F.2d at 91. We conclude that under the *Boeing* standard, this testimony was sufficient to create a question for the jury.

■ Inland Tugs also asserts that the trial court erred as a matter of law in failing to grant a j.n.o.v. or remittitur since Springborn failed to meet his burden of proving when maximum medical cure had been reached.[14] Since the special interrogatory to the jury inquired only as to the amount of maintenance to be awarded, we cannot discern the duration of maintenance. There was testimony at trial that Springborn could return to work as early as November, 1981 [15] or as late as January, 1983.[16] The cut-off date for both maintenance and cure is not the point at which the seaman recovers sufficiently to return to work. Rather, it is the date of maximum possible cure. *Brown v. Aggie & Millie, Inc.,* 485 F.2d 1293, 1296, 1973 A.M.C. 2465, 2467 (5th Cir.1973). Maximum cure is achieved when it is probable that further treatment will result in no betterment of the seaman's condition. *Calmar,* 303 U.S. at 530, 58 S.Ct. at 654, 82 L.Ed. at 998, 1938 A.M.C. at 345; *Farrell v. United States,* 336 U.S. 511, 515, 69 S.Ct. 707, 709, 93 L.Ed. 850, 854, 1949 A.M.C. 613, 619 (1949); *Pelotto v. L & N Towing Co.,* 604 F.2d 396, 404, 1981 A.M.C. 1047, 1051 (5th Cir.1979) (where it appears that the condition is incurable or that further treatment will merely relieve pain and suffering and not otherwise improve the physical condition, it is proper to declare the point of maximum cure); *see also, Cox v. Dravo Corp.,* 517 F.2d 620 (3d Cir.) (en banc), *cert. denied,* 423 U.S. 1020, 96 S.Ct. 457, 46 L.Ed.2d 392 (1975).

■ The only testimony in this case concerning the point at which Springborn reached maximum medical cure is that of Dr. Kenneth Vogel. Dr. Vogel stated during the trial in June, 1983, that Springborn *would* reach maximum medical improve-

---

**14.** The testimony at trial revealed that Springborn received maintenance at the rate of $14 a day from June 29 through July 31, August 7 through December 6, 1981, March 23 through April 26, 1982, April 27 through May 10, 1982, May 11 through May 24, 1982, May 25 through May 31, 1982. On June 1, 1982 no maintenance payments were made because Inland Tugs had not received any medical reports to substantiate maintenance payments. The hiatus between December 6, 1981, and March 23, 1981, was a result of the failure to submit medical bills to substantiate the maintenance payments. Maintenance payments were made again on March 23, 1982, after defendant Inland Tugs received notice that plaintiff underwent surgery with Dr. Vogel.

**15.** Dr. Dabezies so testified.

**16.** Dr. Brown so testified.

ment sometime between March, 1983, and September, 1983. However, Dr. Vogel also testified that the last time he examined Mr. Springborn was on December 21, 1982. Under the *Boeing* standard, we conclude that this evidence was insufficient to create a question for the jury. Dr. Vogel did not state that Springborn had actually reached the point of maximum medical cure and as a result there was no reasonable evidentiary basis for the jury's verdict. Even assuming that Springborn was entitled to receive maintenance until September, 1983, the verdict far exceeds the maximum allowable maintenance. Taking, for example, a maintenance rate of $14 for 598 [17] days would only amount to $8,372.00. At $20 a day it would be $11,960.00.[18] We thus remand this point to the district court for findings on the duration of maintenance.[19]

■■■ Although there was some evidence as to a maintenance rate of $14 a day, the jury award, given the insufficiency of evidence as to duration, was clearly not within the possible awards supported by the evidence. *See supra* notes 16 and 17 and accompanying text. Accordingly, since we are remanding to the trial court on the issue of the duration of maintenance, we conclude that the trial court is better positioned to consider the motion for remittitur[20] or its amount than we are on appeal.

### Barge #1819

Springborn asserts that the trial court erred in failing to grant a j.n.o.v. or new trial on his claim that barge #1819 was unseaworthy. He asserts that barge #1819 was unseaworthy as a matter of law since there was no question that there was a puddle of oil on the barge.

■■■ Under the *Boeing* standard, Springborn's unseaworthiness claim against barge #1819 fails because the facts and reasonable inferences which can be drawn therefrom do not point so overwhelmingly in favor of Springborn that reasonable men could not have arrived at a verdict that barge #1819 was seaworthy. *See, e.g., Robin v. Wilson Brothers Drilling,* 719 F.2d 96, 98 (5th Cir.1983); *Caldwell v. Manhattan Tankers Corp.,* 618 F.2d 361, 363 (5th Cir.1980). Although a vessel owner has an absolute duty to furnish a seaworthy vessel, *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 549, 80 S.Ct. 926, 932, 4 L.Ed.2d 941, 948, 1960 A.M.C.

---

**17.** *See supra* note 14.

| Days not paid maintenance: | Days |
|---|---|
| August 1–August 6, 1981 | 6 |
| December 7, 1981–March 22, 1982 | 105 |
| June 1, 1982–September 30, 1983 | 487 |
| Total | 598 |

**18.** If we took the rate of $200 a week as urged by Springborn ($28.57/day) for 598 days, the award would be $17,084.86. Taking the maintenance award of $62,000 ($75,000—$13,000) for 598 days, Springborn would receive approximately $103.00 per day.

**19.** Springborn's counsel suggests on appeal that the $75,000 verdict took into account the jury's belief that Springborn may need an additional operation sometime in the future. Dr. Brown testified that he might require a lumbosacral fusion sometime in the future. Future maintenance and cure are generally not awarded in a lump sum. An award for maintenance and cure may provide for "future maintenance and cure of a kind and for a period definitely ascertained or ascertainable...." *Calmar,* 303 U.S.

at 530–31, 58 S.Ct. at 654, 82 L.Ed. at 998, 1938 A.M.C. at 345; *Pelotto,* 604 F.2d at 400, 1981 A.M.C. at 1053. With no finding as to the event—future surgery—or the duration, the mere possibility of future surgery in this case was insufficient.

**20.** The grant or refusal to grant a remittitur is within the discretion of the trial judge. Our power to fix a remittitur is the same as that of the trial court. *Harper,* 741 F.2d at 93; *Carlton v. H.C. Price Co.,* 640 F.2d 573, 582 n. 14 (5th Cir.1981); *Howell v. Marmpegaso Compania Naveira S.A.,* 536 F.2d 1032, 1035, 1976 A.M.C. 2475, 2478 (5th Cir.1976). The rule in this Circuit requires us to determine the maximum award which the evidence could support or to remand to the trial court. *Carlton,* 640 F.2d at 582; *Howell,* 536 F.2d at 1033, 1976 A.M.C. 2478. The "maximum recovery" rule permits us to reduce the verdict to the maximum amount the jury could properly have awarded. *See Gorsalitz v. Olin Mathieson Chemical Corp.,* 429 F.2d 1033, 1046–47 (5th Cir.1970), appeal after remand 456 F.2d 180, *cert. denied,* 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807 (1972); *see also Carlton,* 640 F.2d at 582 n. 14.

1503, 1512 (1960); *Mahnich v. Southern Steamship Co.*, 321 U.S. 96, 99, 64 S.Ct. 455, 457, 88 L.Ed. 561, 564 1944 A.M.C. 1, 4 (1944), Springborn must show a causal connection between his injury and the condition of the vessel which renders it unseaworthy. There was evidence from which the jury could have concluded that even if there was a puddle of oil on the deck [21] (i) Springborn did not slip on it [22], or (ii) Springborn may have spilled the oil on the deck himself, or (iii) there was no puddle at all at the time of the accident.

The denial of the motion for directed verdict and j.n.o.v. was proper.

Springborn also argues that the trial court should have granted a new trial. Our review of the trial court's action is limited to whether the trial court abused its discretion. *Smith v. Shell Oil Co.*, 746 F.2d at 1092; *Bazile v. Bisso Marine Co.*, 606 F.2d 101, 105, 1980 A.M.C. 1255, 1260 (5th Cir.1979), *cert. denied*, 449 U.S. 829, 101 S.Ct. 94, 66 L.Ed.2d 33 (1980). We conclude that the trial court did not abuse its discretion in denying a new trial because the facts provide an ample evidentiary basis for the jury's verdict.

### M/V TOM FRAZIER

Springborn also contends that the trial court erred as a matter of law in failing to grant a j.n.o.v. or new trial because the tug, M/V TOM FRAZIER was unseaworthy. First, he urges that the procedure used to add oil to the water pumps was hazardous because it caused oil spills. All of this was attributed to the failure to provide the tug's crew with the proper tools, equipment, instruction, or training to prevent oil spills. Second, he argues that the tug lacked a full crew complement on the night of his accident. As to each point we conclude under the *Boeing* standard that the trial court correctly denied Springborn's motion for j.n.o.v. since there was a reasonable evidentiary basis to support the jury's verdict that the tug was seaworthy. As to the procedures used, the jury could have concluded that the procedure was not hazardous, that there was not an oil spill as a result of the procedure or that Springborn did not fall as a result of the procedure.

Similarly, although the lack of a full complement in the crew may render a vessel unseaworthy, *see, e.g., Comeaux v. T.L. James & Co., Inc.*, 666 F.2d 294, 299 (5th Cir.1982), supplemented, 702 F.2d 1023 (5th Cir.1983), there was ample evidence to support the verdict. Springborn was required to prove that his injury was causally connected to the condition of the vessel which rendered it unseaworthy. *See Caldwell*, 618 F.2d at 363. Captain Croomes, the relief Captain, testified that three men were not needed to work on the shift the morning that Springborn fell. Captain Shell [23] similarly testified that only two men were needed on the shift. Simply stated, the trial court's denial of Springborn's motion for j.n.o.v. was entirely proper based upon the evidence presented. As to Springborn's motion for new trial on the unseaworthiness of the tug, we also think that the district court's denial was not an abuse of discretion.

### The Jones Act

Springborn urges that the same facts which establish the unseaworthiness of the tug and barge compel a finding of Jones Act negligence against Inland Tugs.[24] Springborn moved for both a directed ver-

---

**21.** Defendant Inland Tugs did concede at oral argument that there was a puddle of oil after the accident.

**22.** At trial Springborn stated that he did not know what caused him to fall. There was additional testimony from Asher, the deckhand, that there were no skid marks nor was there oil on Springborn's clothes or shoes.

**23.** Captain Croomes, the relief Captain, was on duty at the time of the accident. Captain Shell came on at 6:00 a.m.

**24.** Springborn asserts Inland Tugs was negligent in failing to provide a safe place to work: (i) one free from hazardous oil spills; (ii) improper supervision, instruction, and training to prevent oil spills; (iii) improper equipment for adding oil to water pumps; and (iv) lack of a full crew.

dict and j.n.o.v. challenging the jury's finding of no negligence.

■ The standard of liability under the Jones Act is the same as under the FELA. *Ferguson v. Moore-McCormick Lines,* 352 U.S. 521, 523, 77 S.Ct. 457, 1 L.Ed.2d 511, 514, 1957 A.M.C. 647, 650 (1957). The standard of review for directed verdicts and j.n.o.v. motions in FELA cases was set forth by the Supreme Court in *Lavender v. Kurn,* 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916, 923 (1946). Under *Lavender,* a directed verdict for the defendant is proper "only when there is a complete absence of probative facts." Thus, the test of a plaintiff's case—one which will survive a defendant's motion for a directed verdict and go to the jury under the FELA—is "simply whether the fruits justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers v. Missouri Pacific Railroad Co.,* 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493, 499 (1957).

In *Boeing v. Shipman,* 411 F.2d 365, 370 (5th Cir.1969) (en banc), we determined that the "reasonable man" standard was appropriate for cases other than FELA and Jones Act cases. *Boeing* specifically recognized that the Jones Act featherweight standard was designed to make it easier for the seaman to prove liability than in the usual negligence cases. *See Davis v. Hill Engineering, Inc.,* 549 F.2d 314, 331, 1977 A.M.C. 1090, 1111 (5th Cir.1977). Thus, under the Jones Act *Lavender* standard, a directed verdict for the defendant is possible only when there is a complete absence of probative facts supporting the nonmovant's position.

While we have applied the *Lavender* standard without question on a defendant-employer's motion for a directed verdict or j.n.o.v., we have been skeptical about its application to a jury verdict in favor of the defendant employer when the plaintiff seaman challenges it by requesting a j.n.o.v. We now discuss our prior cases which have wrestled with, but not decided, the appropriate standard to apply when the seaman moves for a directed verdict or j.n.o.v. against his employer.

In *Allen v. Seacoast Products, Inc.,* 623 F.2d 355, 360, 1981 A.M.C. 1341, 1345 (5th Cir.1980), we first questioned whether the *Lavender* standard should be applied to a directed verdict or j.n.o.v. in a seaman's favor. While we said in *Allen* that there was much reason to apply the usual *Boeing* standard to verdicts in a seaman's favor and limit the FELA standard to verdicts in a seaman's favor and limit the FELA standard to directed verdicts against seamen, we did not decide the issue because the *Boeing* standard in *Allen* was clearly applicable to the unseaworthiness claims. In our musings in *Allen,* we observed that the *Boeing* reasonable man standard, when applied to a directed verdict in a seaman's favor, requires evidence more "overwhelming" than for a directed verdict in defendant's favor. From this we reasoned that the difference in application suggested that even using the *Boeing* standard for a directed verdict in a seaman's favor will nonetheless result in a standard almost as strict as the FELA *Lavender* standard. *Allen* at 360 n. 9. However, we did not decide which standard—*Lavender* or *Boeing*—would govern the seaman's motion since the evidence in *Allen* allowed us to sustain a directed verdict in favor of the seaman under the *Boeing* standard.

Next in the litany of cases where we discussed, but never decided, the question of which standard should be applied when the seaman makes a motion for directed verdict or j.n.o.v., was *Comeaux v. T.L. James & Co., Inc.,* 666 F.2d 294 (5th Cir. 1982). In *Comeaux* we described the *Boeing* standard as not applying to Jones Act claims which permit the more lax FELA standard. Our language in *Comeaux* has caused needless confusion because the court has used its terminology variously to describe the FELA standard as strict in *Allen* and as lax in *Comeaux.* The difference, of course, depends upon from whose perspective—plaintiff or defendant—one

views the standard.[25] Despite our use of the words lax and strict, there has never been confusion that under the *Lavender* standard a directed verdict is possible "only when there is a complete absence of probative facts" supporting the nonmovant's position, while under the *Boeing* standard, a directed verdict is possible when facts and inferences point overwhelmingly in favor of the moving party so that reasonable men could not arrive at a contrary verdict.

In *Jussila v. M/T LOUISIANA BRIM-STONE*, 691 F.2d 217, 219 (5th Cir.1982), we were once again writing from the defendant's standpoint and thus described the standard under the FELA as stringent. In *Jussila* we observed that the *Lavender* standard has been applied only when the defendant, the seaman's employer, has moved for a directed verdict. But in *Jussila*, like *Allen*, we never reached the question of which standard applies to the seaman's motion for directed verdict on a Jones Act claim because a review of the evidence showed that *Jussila* could not satisfy even the *Boeing* standard which would more readily permit a directed verdict than the FELA *Lavender* standard.

Next came our sua sponte supplemental opinion in *Comeaux v. T.L. James & Co., Inc.*, 702 F.2d 1023, 1024 (5th Cir.1983). In this opinion we noted that the seaman's burden in getting to the jury under the FELA requires only a showing of slight negligence. We suggested that in keeping with this less demanding standard of proof of causation, the test for sufficiency of evidence in a Jones Act case also requires less evidence to support a directed verdict or j.n.o.v. motion.

In *Robin v. Wilson Brothers Drilling*, 719 F.2d 96, 98 (5th Cir.1983), we again pointed to the unsettled nature of the appropriate standard for review when a seaman asks for a directed verdict. Finally, in *Thornton v. Gulf Fleet Marine Corp.*, 752 F.2d 1074, 1076 (5th Cir.1985), we stated that the differing standard depended upon

who prevails before the jury in a Jones Act negligence claim; but consistent with *Robin, Jussila,* and *Allen,* found that even applying the *Boeing* standard, the jury verdict in favor of the defendant was properly upheld. Nonetheless, we discussed at some length our feeling that it would defeat the purpose of the Jones Act and FELA to make it easier for a defendant by the introduction of the slightest amount of evidence to block a directed verdict or j.n. o.v. in favor of the injured plaintiff.

In *Thornton,* we observed that the very purpose of the Jones Act/FELA *Lavender* standard is to make recovery on part of the plaintiff easier to prove than in the usual civil tort case. We stated that it would thwart this purpose significantly to hold that the standard which enables a seaman to get to the jury if there is some, no matter how little probative evidence, would enable a defendant to defeat a plaintiff's motion for directed verdict or j.n.o.v. on the ground that there is some, no matter how little, probative evidence introduced which was favorable to the defendant. While we did not resolve this issue in *Thornton, Robin, Jussila,* or *Allen,* today we choose to end the confusion over what standard applies to a seaman's motion for directed verdict or j.n.o.v. and send the controversy "to an honorable rest in the briny deep." *Law v. Sea Drilling Corp.*, 523 F.2d 793, 798, 1977 A.M.C. 2394, 2399 (5th Cir.1975).

We are convinced that the application of the *Boeing* "reasonable man" standard to a seaman's motion for directed verdict or j.n.o.v. furthers the Jones Act's purpose to reduce the seaman's burden in proving liability. Therefore, when the defendant moves for a directed verdict, we deny it and let the case go to the jury if there is slight evidence supporting the plaintiff. Similarly, we deny the defendant's motion for j.n.o.v. if the jury has decided for the plaintiff and the defendant seeks to escape the verdict. It does not follow that the plaintiff is entitled to a

---

**25.** To avoid further confusion, we believe use of the shorthand *Boeing* or *Lavender* to be prefer-

able to loose or strict.

directed verdict if there is only slight evidence in his favor, for the jury may disbelieve him. However, it does not follow that, if the defendant wins the verdict, the plaintiff should be able to overturn it if there is only slight evidence in his favor. The plaintiff should prevail on these motions only if the facts and inferences point so strongly in his favor that the court believes that reasonable men could not arrive at a contrary verdict. We now proceed to apply the *Boeing* standard in the case before us.

 The scope of review in *Boeing* provides that a directed verdict or j.n.o.v. is proper only "if the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict...." *Boeing*, 411 F.2d at 374. We conclude that the facts alleged by Springborn on his claim of unseaworthiness, which he reurges in support of his Jones Act cause, do not meet the *Boeing* reasonable man standard. While the facts that give rise to unseaworthiness claims sometimes support Jones Act negligence claims, each is a distinct claim. *Thezan v. Maritime Overseas Corp.*, 708 F.2d 175, 180 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984). The jury answered "no" to the special interrogatories concerning negligence and their determination was supported by the evidence. For the reasons stated earlier in our unseaworthiness discussion, we conclude that there was ample evidence to support the jury's verdict and uphold the trial court's denial of a directed verdict and j.n.o.v.

#### Special Interrogatories

 Next, Springborn argues that special interrogatory No. 9, which found him 50% contributorily negligent, was inconsistent with the findings of no negligence or unseaworthiness. The Seventh Amendment requires that if there is a view of the case which makes the jury's answers to the special interrogatories consistent, the court must adopt it and enter judgment

accordingly. *Atlantic & Gulf Stevedores v. Ellerman Lines Ltd.*, 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798, 806–07, 1962 A.M.C. 276, 279–80 (1962); *Smith v. Shell Oil Co.*, 746 F.2d at 1092; *Griffin v. Matherne*, 471 F.2d 911, 915 (5th Cir.1973). Our review of the record persuades us that there is evidence to support a view which makes the jury's interrogatory answers consistent, or at least not inconsistent. We think that the jury could have concluded that Springborn's actions were partially responsible for his fall and that his accident was operationally the result of another cause or causes which were not the fault of the defendants. The evidence is consistent with this view of the interrogatories. Springborn's argument is without merit. *Thornton*, 752 F.2d at 1075.

AFFIRMED IN PART, REVERSED IN PART and REMANDED.

GARWOOD, Circuit Judge, specially concurring.

I concur in the judgment and in all of the majority opinion except the portion stating that in FELA and Jones Act cases the plaintiff's claim of entitlement to a directed verdict or judgment n.o.v. in his favor is judged under the standard set forth in *Boeing v. Shipman*, 411 F.2d 365, 370 (5th Cir.1969) for cases *other than* Jones Act and FELA cases, while the defendant's claim of entitlement to a directed verdict or judgment n.o.v. in his favor is judged under the standard set forth in *Lavender v. Kurn*, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946); in other words, that it should be easier for the plaintiff to get a directed verdict than for the defendant to do so.

Decision of this "issue" is not pressed upon us by either party and is wholly unnecessary to disposition of this appeal, the evidence here obviously being amply sufficient to justify the jury's verdict no matter what standard is employed, as the majority recognizes.

Since the majority nevertheless states its views on the matter, I will briefly express mine. In the conceded absence of control-

ling precedent compelling such a holding,[*] I would not embrace this sort of result-oriented double standard.

The directed verdict-judgment n.o.v. standard can be seen either as a jurisdictional boundary—marking the division of power between judge and jury—or as a means to help ensure that judgments rest on factual truth. In neither perspective is use of a double standard appropriate. If we trust the jury as a decision maker, we must trust it to decide for either party. Otherwise we demean the jury which is so hallowed in our traditions and in our Constitution. If justice demands that verdicts rest on factual truth, then the degree of offense to justice is the degree to which verdicts vary from the truth, not the degree to which they vary from being in favor of one party or the other. The whole concept of an independent judiciary and the rule of law as we understand it, and have understood it for centuries, is based on rules of general application, evenhandedly applied. No one is above or below the law, and our duty is to "administer justice without respect to persons, and do equal right to the poor and to the rich." Though the wound to principle here is slight, the principle is one that lies close to the heart.

---

[*] Indeed, I find it difficult to reconcile the majority's view with this Court's statement in *Campbell v. Seacoast Products, Inc.,* 581 F.2d 98, 99 n. 2 (5th Cir.1978), evaluating a claim that the evidence was insufficient to support a jury finding that the Jones Act employer was not negligent, that "[t]he *Lavender* standard is applicable whether the jury verdict favors the plaintiff or defendant." Moreover, we recognized in *Robin v. Wilson Brothers Drilling,* 719 F.2d 96, 98 n. 2 (5th Cir.1983), that "this court has consistently applied the FELA [*Lavender*] standard" to claims that there is insufficient evidence to support a jury finding that a Jones Act plaintiff was contributorily negligent. *See Fontenot v. Teledyne Movible Offshore, Inc.,* 714 F.2d 17, 19 (5th Cir.1983) ("This court applies the same standard whether reviewing findings regarding a defendant's or a plaintiff's negligence.") (Jones Act); *McBride v. Loffland Brothers Company,* 422 F.2d 363, 365 (5th Cir.1970) ("[W]e can see no reason why the [*Lavender*] rule should not operate equally and evenhandedly as to negligence and contributory negligence. We so hold.") (Jones Act). *See also Fleming v. American Export Isbrandtsen Lines, Inc.,* 451 F.2d 1329, 1331 (2d Cir.1971) ("The same [*Lavender*] test applies in determining the sufficiency of the evidence as to a plaintiff-seaman's contributory negligence."). I do not understand why we should undertake to state views contrary to those of the above-cited decisions of this Court, particularly where that is not necessary to the disposition we make of the case before us.