NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

NO. 07-1296

HAROLD TOLSON

VERSUS

OMEGA PROTEIN, INC.

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-EIGHTH JUDICIAL DISTRICT COURT,
PARISH OF CAMERON, NO. 10-16445
HONORABLE H. WARD FONTENOT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

JIMMIE C. PETERS
JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Jimmie C. Peters, Elizabeth A. Pickett and Billy H. Ezell, Judges.

AFFIRMED.

Jennifer Jones
Jones Law Firm
Post Office Box 1550
Cameron, LA 70631
(337) 775-5714
COUNSEL FOR PLANTIFF/APPELLANT:
    Harold Tolson

Alan K. Breaud
Timothy W. Basden
Breaud & Meyers
Post Office Drawer 3448
Lafayette, LA 70502
(337) 266-2200
COUNSEL FOR DEFENDANT/APPELLEE:
    Omega Protein, Inc.

PETERS, J.

The plaintiff in this offshore lawsuit, Harold Tolson, appeals the trial court judgment rendered in favor of the defendant, Omega Protein, Inc., dismissing his claim for general and special damages he sustained in a slip and fall accident aboard the *F/V Oyster Bayou* off the Louisiana coast. Omega Protein, Inc. also appeals the judgment, asserting that the trial court erred in its judgment awarding maintenance and cure benefits. For the following reasons, we affirm the trial court judgment in all respects.

## DISCUSSION OF THE RECORD

This litigation arises from an accident which occurred on May 30, 2002, in the Gulf of Mexico off the coast of Cameron Parish, Louisiana, onboard the *F/V Oyster Bayou*, a menhaden fishing vessel owned and operated by Omega Protein, Inc. (Omega). On that day, the vessel was involved in a commercial fishing operation that consisted of locating schools of fish, launching two small boats known as purse boats, surrounding and netting the schools by use of the purse boats, and transferring the catch to the *F/V Oyster Bayou.* Mr. Tolson worked on one of the purse boats as a "bunt pile man." He described his duties at trial as unhooking his particular purse boat from the *F/V Oyster Bayou* and allowing it to slide into the water, spreading and threading the nets as they ran through the power blocks controlling their release into the water, and reversing the process as the nets were pulled through the power blocks back into the purse boat.

By mid-morning of May 30, 2002, the crew of the *F/V Oyster Bayou* had completed one fishing operation. While awaiting the signal that another school of fish had been located, Mr. Tolson and some of the other crew members went to the galley to get something to eat. Most of those going into the galley did not bother to

remove the slicker suits[1] they had been wearing during the fishing operation, and all were wearing their company-issued rubber boots.[2] When the signal sounded announcing the next fishing operation, Mr. Tolson and the crew in the galley proceeded on deck toward the purse boats. Mr. Tolson was the last to exit the galley. As he moved toward the galley exit, he slipped and fell, injuring his ankle.

On February 23, 2004, Mr. Tolson filed the instant action against Omega, asserting a claim under the Jones Act, 46 U.S.C. § 688; a claim in general maritime law under the doctrine of unseaworthiness; and a claim for maintenance and cure benefits. With regard to the particulars of the accident itself, Mr. Tolson asserted in his petition that the design of the galley floor, coupled with the presence of slippery substances on that floor, created "an unreasonably dangerous condition for seamen," thereby rendering the *F/V Oyster Bayou* unseaworthy. He further asserted that Omega was negligent in failing to provide him, a Jones Act seaman, with a reasonably safe place to work. With regard to his injuries, Mr. Tolson asserted that Omega negligently required him to continue to perform his full duties prior to his recovery, and that this action worsened his condition and caused an increase in his pain and suffering. Concerning his maintenance and cure claim, Mr. Tolson asserted that it was not until November of 2002, or five to six months after the accident, that Omega provided him with the surgery recommended by his treating physicians. Thus, he claimed that because of the arbitrary and capricious nature of the failure to provide maintenance, he is entitled to attorney fees. Trial on the merits occurred on February 22, 2006. After completion of the evidentiary portion of the trial, the trial court took

---

[1]The slicker suits were also referred to in testimony as "skins."

[2]Mr. Tolson had removed his slicker suit before entering the galley area.

the issues under advisement. Thereafter, the trial court rendered reasons for judgment[3] wherein it rejected Mr. Tolson's liability claims but awarded him maintenance benefits in the amount of $30.00 per day from November 8, 2002, until he reached maximum medical improvement. As previously stated, both parties have appealed.

In his appeal, Mr. Tolson raises three assignments of error:

1. The trial court's ruling that the *F/V Oyster Bayou* was not unseaworthy is clearly erroneous.

2. The trial court's ruling that Defendant Omega Protein, Inc. was not negligent is clearly erroneous.

3. The trial court's denial of Plaintiff's request for attorney's fees is clearly erroneous.

In its appeal, Omega raises two assignments of error:

1. The trial court erred when it ruled in its Judgment of July 31, 2006 that Harold Tolson had not reached maximum medical improvement and that Omega Protein had a continuing obligation to pay maintenance and cure following the pretrial deposition of Dr. Clark Gunderson on February 2, 2006.

2. The trial court erred when it ordered in its Judgment of February 8, 2007 that maintenance should have been paid to Tolson at a rate of $30.00 per day.

## OPINION

## *UNSEAWORTHINESS & JONES ACT NEGLIGENCE*

Mr. Tolson claims a right of recovery under two theories of general liability: unseaworthiness and negligence. In his first two assignments of error, Mr. Tolson asserts that the trial court erred in concluding that the *F/V Oyster Bayou* was not

---

[3]The trial court resolved the issues before it in two separate filings. The first, which was filed June 15, 2006, addressed the general liability issues. The second, which was filed January 8, 2007, addressed the maintenance and cure issue.

3

unseaworthy, and that the trial court erred in concluding that Omega was not negligent in causing his accident.

Jones Act negligence and unseaworthiness are two separate and distinct claims. *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 91 S.Ct. 514 (1971). The owner of a vessel has an absolute duty to furnish a seaworthy vessel, and breach of that duty gives rise to a claim for general damages. *Vendetto v. Sonat Offshore Drilling Co.*, 97-3103 (La. 1/20/99), 725 So.2d 474, *cert. denied*, 527 U.S. 1023, 119 S.Ct. 2369 (1999). With regard to a claim based on unseaworthiness, our supreme court has stated the following:

> A vessel is unseaworthy unless all of its appurtenances and crew are reasonably fit and safe for their intended purposes.
>
> Our case law places a very high burden on a vessel owner to provide its crew with a seaworthy ship. This duty is absolute, non-delegable and completely independent of the Jones Act requirement to exercise reasonable care. To prevail on an unseaworthiness claim, a seaman must prove that the unseaworthy condition was the proximate cause of his injury.
>
> An owner's absolute duty to provide a seaworthy vessel may not be delegated to anyone. Liability for an unseaworthy condition does not depend on negligence, fault or blame. Thus, if an owner does not provide a seaworthy vessel, then no amount of prudence will excuse him, whether he knew of or should have known of the unseaworthy condition. T.J. Schoenbaum, Admiralty and Maritime Law, Second Edition § 6-26 (1994).

*Foster v. Destin Trading Corp.*, 96-803, p. 5 (La. 5/30/97), 700 So.2d 199, 202-03 (case citations omitted). Additionally,

> Unseaworthiness results from a defective condition and is not the result of an isolated negligent act. Also, wear and tear which result in the deterioration of equipment may render a previously seaworthy vessel unseaworthy.

*Id.* at 204 (citations omitted).

4

The Jones Act allows an injured seaman to bring a negligence action against his employer. 46 U.S.C. § 688.[4] Negligence may arise in many ways, including the failure to use reasonable care to provide a seaman with a safe place to work, the existence of a dangerous condition on or about the vessel, or any other breach of the owner's duty of care. 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 6-21, at 312 (2d ed. 1994). The duty of care owed by an employer under the Jones Act is that of ordinary prudence. That is to say, the employer has the duty to take reasonable care under the circumstances. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335-336 (5th Cir. 1997). Although the seaman bears the evidentiary burden of proving that a breach of the duty owed by the employer was a cause of his injuries, the Jones Act requires only that there be some evidence of negligence, however slight, which caused the plaintiff's injuries. *Rannals v. Diamond Jo Casino*, 265 F.3d 442 (6th Cir. 2001).

Although Mr. Tolson's accident was unwitnessed, the fact that an accident occurred is not in dispute. Mr. Tolson testified that as he moved toward the door to exit the galley, his foot suddenly came out from under him and he fell completely to the floor. According to Mr. Tolson, he was proceeding in an unhurried manner and was looking straight ahead. When he attempted to rise, he could not put any pressure on his ankle. He then opened the door to the galley, hopped out on one foot, and sat on the rail immediately outside the door.

When he failed to arrive at his appointed post on the purse boat, crew members began to look for him. They observed him leaning against the railing outside the galley. Some of the crew came to his assistance by helping him into the galley, where

---

[4]Mr. Tolson's claim under the Jones Act, although brought in state court, is subject to federal substantive maritime law. *Coutee v. Global Marine Drilling Co.*, 05-756 (La. 2/22/06), 924 So.2d 112.

he propped up his foot and placed an ice pack on his ankle. The crew members then returned to the fishing operation. When the vessel returned to port that evening, Michael Lumbardo, Omega's personnel manager, met the ship and took Mr. Tolson to a physician in Sulphur, Louisiana.

The galley floor is constructed of steel, and slants downward from bow to stern at a rate of approximately two to two and one-half inches per foot.[5] It is subject to a normal maintenance schedule during the fishing season, and is generally painted with a rustoleum paint in the off season.[6] Although the floor surface is not considered to be a "non-slip" surface, the high foot traffic passing through the area renders the surface rough and pitted. The galley walls do not have a hand rail for balance.

Mr. Tolson cannot identify a specific substance upon which he slipped but suggests that the galley floor is slippery even when dry. At trial, and on appeal, he asserts that a combination of conditions in the galley rendered the vessel unseaworthy and that Omega's agents and employees were negligent in failing to remedy the unsafe conditions before he sustained his injury. He asserts that the slanted floor, the lack of a handrail in the galley area, the evidence of leakage from a refrigerator and sink in the kitchen, and the lack of a rule prohibiting crew members from wearing their wet slicker suits and boots in the galley area combined with the naturally slippery nature of the floor to render it unreasonably dangerous. In support of his assertions, he points to his testimony that crew members warned him of the slick

---

[5]The *F/V Oyster Bayou* is 165 feet long and the slant was described by testimony as approximately twelve inches for every twenty-five to thirty feet of vessel length.

[6]The fishing season runs from approximately the middle of April until the end of October of each year.

nature of the galley floor when he first came on board the *F/V Oyster Bayou,*[7] and other testimony concerning slipping incidents in the same general area. The trial court, in its reasons for judgment, analyzed the testimony of all witnesses who testified concerning this issue and reached the following factual conclusions:

> In weighing the evidence on the question of negligence of the owners and operators of the Oyster Bayou, the court makes this observation: 1) There is no evidence that anyone ever notified the captain or any other officers on the vessel or their superiors alerting them as to any unsafe condition of the vessel's galley floor; 2) No other incident of anyone falling in the galley area is known to have been reported. 3) On the question of unseaworthiness, the testimony of the crewmen who were actually encountering the galley floor every work day of the 2002 fishing season indicate that the floor was unremarkable, and hence, reasonably suited for its function.

In reaching these factual conclusions, the trial court stated that it considered the testimony of a number of the supervisory personnel assigned to the vessel as well as that of individual crew members who testified. Concerning this testimony, the trial court stated:

> To summarize this body of testimony, nine of the ten crew members did not find the galley floor to be slippery from their personal experiences. A few of them, such as Lincoln Carter and John Martin, Sr., said that they had heard of others slipping, but were vague about the persons involved and did not relate the time and circumstances of any incident.
>
> The only crew member who stated that he personally had found the area to be slippery was Donny Ray Parker. However, a search of his testimony discloses that he does not expand at all on why it was slippery or what the circumstances were when he found it to be that way.

*Condition of the Floor at the Time of the Accident.*

There does exist evidence that from time to time moisture could be found on the galley floor. John Martin, a fisherman, testified that water from crew members'

---

[7]His first tour on the *F/V Oyster Bayou* was 2002. Therefore, he had only served on the vessel for slightly over one month before the accident.

skins and boots would often accumulate on the floor because the men would hose themselves down before entering the galley. Additionally, he recalled observing a skid mark on the galley floor in the vicinity of Mr. Tolson's accident. In stating his belief in the cause of the skid mark, he "guess[ed] the floor was damp, or whatever." Luther Turner, the vessel's cook, acknowledged that there was a place on the floor where condensation would form from time to time, and that there existed the possibility of leakage from a refrigerator drip pan during rough seas.[8] Walter Green, a fisherman, described a leak from a sink that caused water to run down the side of the galley from time-to-time. However, none of these witnesses testified that the leakage situations they described were present on the day of Mr. Tolson's accident. In fact, the evidence was overwhelming to the contrary.

Steven Donald Mitchell was the vessel's captain at the time of Mr. Tolson's accident and was one of those who initially came to Mr. Tolson's aid. After he was assisted into the galley, Mr. Tolson pointed out where he fell to Captain Mitchell, who inspected the floor and found no substance upon which Mr. Tolson might have slipped. Adam Moore, the vessel's first mate, was also present in the galley when Mr. Tolson pointed out the accident scene and did not recall seeing any substance in the area to which he was directed. Lincoln Carter, a fisherman, testified that he had been in the galley the morning of the accident and observed nothing on the floor. James E. Griffin, another fisherman, exited the galley immediately before Mr. Tolson and observed no substance on the floor.

Given the complete lack of evidence that a foreign substance caused Mr. Tolson's accident, the remaining question relates to the nature of the floor when dry.

---

[8]On the day of Mr. Tolson's accident, the seas were relatively calm.

*Inherently Slippery Nature of the Floor/History of Slip and Fall Accidents.*

Mr. Tolson testified that when he first arrived on the vessel, a number of the crew members warned him that the galley floor was slippery. Although he never reported any problem with the floor, he claimed to have slipped without falling three or four times in the approximately forty-five days he served on the vessel before his May 30, 2002 accident. He also claims to have seen Gene Bryant, Donald Ray Parker, Cleveland Smith, and Luther Turner slip on occasion.

Mr. Turner, who had served as the vessel's cook for eight years, testified that he "might have slipped" in the area of Mr. Tolson's accident on one occasion while carrying a pot of soup, but he did not consider the floor to be exceptionally slippery. Additionally, Mr. Green testified that Gene Bryant had told him on one occasion that he had slipped on the floor, but that he did not fall.[9] On the other hand, Captain Mitchell and Mr. Moore testified that since beginning service on the *F/V Oyster Bayou* in 1997, neither of them had ever received a complaint concerning the condition of the galley floor. Alfred Crockett, the vessel's pilot, and Lincoln Carter, a fisherman, also began their service on *F/V Oyster Bayou* in 1997. Neither of these men recalled ever hearing any complaints concerning the galley floor during those years. Both Mr. Griffin and Raymond Lee Robertson, Jr., the vessel's chief engineer, presented similar testimony, although neither testified concerning their length of service on the vessel.

The only direct evidence concerning the inherently slippery nature of the floor was presented by Tracy Bailey, who worked on *F/V Oyster Bayou* in 2003, the year

---

[9]Mr. Bryant did not testify.

after Mr. Tolson's accident. Working with an entirely different crew,[10] Mr. Bailey claims to have slipped in the galley several times in that year. He testified that he and others who worked in 2003 reported the situation to the vessel's captain[11] who took specific steps to correct the situation.[12] The trial court discounted Mr. Bailey's testimony based on the fact that he did not work on the *F/V Oyster Bayou* during the same fishing season as did Mr. Tolson, and that he worked with an entirely different captain and crew. In the trial court's view, Mr. Bailey's "observations of the physical condition of the [vessel's] galley, a year or more later, could just as easily relate to the maintenance practices of a different cook or from the different standards required under the new captain."

*Summary*

Factual findings in claims under the Jones Act and the doctrine of unseaworthiness are to be reviewed under the manifest error standard. *Foster*, 700 So.2d 199. We find no manifest error in the trial court's factual findings that the *F/V Oyster Bayou* was fit for its intended purpose and that Omega was not negligent. The evidence does not establish that any of the conditions complained of by Mr. Tolson contributed in any way to his slip and fall. Therefore, we find no merit in his assignments of error addressing his unseaworthiness and Jones Act claims.

---

[10]Mr. Bailey suggested that many of the crew members were Mexican laborers who could speak little English.

[11]Captain Mitchell had already transferred to another vessel when Mr. Bailey joined the crew. He identified the vessel's captain as Emerson Hardy.

[12]According to Mr. Bailey, when Omega did not respond to Captain Hardy's requests to repair the floor, the captain took it upon himself one weekend to make the necessary changes.

*Maximum Medical Recovery Issue*

Maintenance and cure is a duty imposed on a vessel's owner to provide food, lodging, and necessary medical services to a seaman who has become injured or ill while in service to the ship. *Sims v. Wood Towing Co., Inc.*, 99-869 (La.App. 5 Cir. 2/16/00), 757 So.2d 783, *writ denied*, 00-1539 (La. 6/30/00), 767 So.2d 41. The duty extends during the period when a seaman is incapacitated and continues until he reaches maximum medical recovery. *Breese v. AWI, Inc.*, 823 F.2d 100 (5th Cir. 1987). "[M]aximum cure is achieved when it appears probable that further treatment will result in no [b]etterment of the seaman's condition." *Pelotto v. L&N Towing Co.*, 604 F.2d 396, 400 (5th Cir. 1979). "[W]here it appears that the seaman's condition is incurable, or that future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition, it is proper to declare that the point of maximum cure has been achieved." *Id.* at 400. A seaman's right to maintenance and cure is an issue of general maritime law, *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 616 (5th Cir.1985), which is reviewed under the clearly erroneous standard, which is the same manifestly erroneous or clearly wrong standard of review used by Louisiana appellate courts in reviewing factual findings. *Comeaux v. Basin Marine, Inc.*, 93-1624 (La.App. 1 Cir. 6/24/94), 640 So.2d 833, *writ denied*, 94-2307 (La. 11/18/94), 646 So.2d 386. Where there are ambiguities or doubts as to a seaman's right to receive maintenance and cure, they are resolved in favor of the seaman. *Vaughan v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997 (1962).

In its June 15, 2006 reasons for judgment, the trial court noted the following concerning Mr. Tolson's injuries and subsequent treatment:

11

[The Monday after the accident], Tolson returned to work but was unable to perform his full duties. He saw Dr. Michael J. DeVall on Tuesday, June 4, 2002. Dr. DeVall made a diagnosis of severe ankle sprain and recommended that Tolson wear an ankle brace and undergo a rehabilitation program. He then saw Tolson two weeks later, noted that the ankle was still slightly swollen, but other than that, considered that he was recuperating. During this time, Tolson was working regularly but had traded places with another fisherman and was performing the lighter chores of a seine setter.

Tolson finished the fishing season but returned to see Dr. DeVall in November complaining that he still had pain in his ankle. Dr. DeVall ordered an MRI and he diagnosed Tolson with avascular necrosis in his ankle. The doctor performed a procedure in which he cut away dead bone and drilled holes in the surrounding bone in the hope that new bone would grow. Unfortunately, four months after the procedure, examination disclosed that Tolson's condition was not showing any significant improvement. In June, a CT scan was performed and Dr. DeVall determined that the ankle was still in need of some correction. He told Tolson that further surgery would be necessary and suggested that he consult with another physician.

Tolson was first seen by Dr. Clark Gunderson on August 13, 2003. Gunderson recommended that the ankle be fused. On April 1, 2004 Dr. Gunderson made the first attempt for a fusion of the ankle but the result was not satisfactory. The procedure was performed again with more structural support and bone graft and was pronounced by Dr. Gunderson to be a success. Nevertheless, Dr. Gunderson recognized that Tolson would not be able to perform heavy labor and would not recommend that he return to the kind of work which was required on a menhaden fishing vessel. It was Dr. Gunderson's opinion that Tolson had received as much improvement as could be achieved through surgery. He did believe that rehabilitation through physical therapy would enhance Tolson's abilities and through this program, he could possibly experience recovery very close to his pre-accident capabilities.

Given Dr. Gunderson's belief that physical therapy would help Mr. Tolson regain his pre-accident capabilities, the trial court ordered "that Omega [remain] liable for maintenance and cure until it is established medically that no further improvement in Tolson's ailments related to his injured ankle can be realized through therapy or other related treatments."

In arguing that the trial court erred in finding continuing liability on its part, Omega points to Dr. Gunderson's deposition testimony, taken two weeks before trial,

wherein the doctor stated that there was nothing more surgically that he could offer Mr. Tolson. Omega asserts that this testimony also establishes that Dr. Gunderson had not prescribed additional rehabilitation, and that the trial court relied not on Dr. Gunderson's testimony, but on an undated prescription for additional physical therapy introduced at trial by Mr. Tolson as proof of his continuing need for professional rehabilitation.

In rejecting this argument, we first note that the trial court does not mention the undated prescription in its reasons for judgment. Additionally, as pointed out in Mr. Tolson's brief to this court, Dr. Gunderson specifically testified to the necessity for future rehabilitation so the patient could regain the use of his physical functions, and both Mr. and Mrs. Tolson testified that an appointment immediately after the deposition was taken generated the prescription for future physical therapy. We find no error in the trial court's conclusion that Mr. Tolson had not reached maximum medical recovery.

*Amount of Daily Benefit Issue*

Maintenance is a form of compensation that arises out of the employment contract. It is a daily stipend for living expenses, or an amount covering expenses for the cost of food and lodging that is equivalent to the food and lodging that the seaman would have received on the vessel. *Crane v. Diamond Offshore Drilling, Inc.*, 99-166 (La.App. 5th Cir. 9/15/99), 743 So.2d 780; *Springborn v. Am. Commercial Barge Lines, Inc.*, 767 F.2d 89 (5th Cir. 1985). The amount of maintenance to which a seaman is entitled is a question of fact to be decided based upon the evidence presented to the trial court. *Springborn,* 767 F.2d 89. Here, the trail court ordered maintenance in the amount of $30.00 per day.

Omega argues that it should only be required to pay $20.00 per day, asserting that

> Tolson presented expenses for insurance, car payments, telephone expenses, cable television and other similar items. None of these items are within the scope of maintenance, which is solely limited to room and board for a single seaman, in a manner equivalent to the room and board provided aboard the vessel.

We disagree. Review of Mrs. Tolson's testimony at the hearing on this issue reflects that the expenses claimed included only the house note or the trailer's lot rental, house insurance, electricity, natural gas, water & sewerage, and food. All of these expenses are costs that are included within the definition of food and lodging. *Hall v. Noble Drilling*, 242 F.3d 582 (5th Cir. 2001) "'Lodging' includes expenses 'necessary to the provision of habitable housing,' such as heat, electricity, home insurance, and real estate taxes." *Id.* at 587, fn. 17.

Prior to September 24, 2005,[13] Mr. Tolson had actual expenses of $31.36 per day. For two and a half months after Hurricane Rita, the Tolsons lived in a shelter in Shreveport, Louisiana, and although they paid no rent during that time, they were still liable for the house note.[14] On December 13, 2005, the Tolsons moved into a trailer provided to them for one year by the First Baptist Church in Shreveport. At the hearing, Ms. Tolson explained that their current expenses, while living in the trailer rent-free, totaled approximately $18.97 per day.

In determining the maintenance award, the court must first "estimate two amounts: the plaintiff seaman's actual costs of food and lodging; and the reasonable cost of food and lodging for a single seaman in the locality of the plaintiff." *Hall,*

---

[13]Mr. Tolson's house was destroyed by Hurricane Rita on this date.

[14]The Tolsons' insurance company has since paid off their mortgage, and they no longer have a note to pay on their home that was destroyed.

242 F.3d at 590. Here, Mr. Tolson's expenses varied between $31.36 per day and $18.97 per day, while the trial court found that a reasonable maintenance figure for this area is $30.00 per day. "Second, the court must compare the seaman's actual expenses to reasonable expenses." *Id.* at 590. The general rule is that the court should award actual expenses unless those actual expenses exceed reasonable expenses. Third, the court must consider whether the exception to this general rule applies: "[i]f the court concludes that the plaintiff's actual expenses were inadequate to provide him with reasonable food and lodging, the plaintiff is entitled to the amount that the court has determined is the reasonable cost of food and lodging." *Id.* at 590.

Here, the trial court awarded $30.00 per day, apparently reaching the conclusion that Mr. Tolson's expenses of $18.97 per day, while living in housing that was provided for free for one year, were not adequate to provide him with reasonable lodging and food. We find no manifest error in the trail court's factual finding that $30 per day was just and reasonable under these circumstances and therefore find no merit in this assignment of error.

*Attorney Fee Issue*

"An award for attorney's fees is proper only if the employer has been found to have acted in a fashion which is 'callous and recalcitrant, arbitrary and capricious, or willful, callous, and persistent.'" *Muhammad v. Diamond Offshore Co.*, 02-172, p. 11 (La.App. 3 Cir. 7/10/02), 822 So.2d 869, 877, *writ denied*, 02-2409 (La. 11/27/02), 831 So.2d 279, *cert. denied*, 538 U.S. 1056, 123 S.Ct. 2215 (2003). Here, the trial court found that Omega did not act in bad faith in concluding that maximum medical cure had been reached, and therefore terminating benefits. The trial court also found that Omega's actions in paying maintenance at a rate of $20.00 a day, when the trial

15

court ordered that maintenance be paid at $30.00 per day, did not justify an award of attorney fees when Mr. Tolson had not notified Omega that the maintenance was inadequate until shortly before trial.  Based on our review of the record, we cannot find that the trial court erred in declining to award attorney fees in this case.

## DISPOSITION

We affirm the trial court judgment in all respects.  With regard to the costs of court on appeal, we tax each party with fifty percent of that cost.

**AFFIRMED.**

**This opinion is NOT DESIGNATED FOR PUBLICATION. Rule 2-16.3, Uniform Rules, Courts of Appeal.**